<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

OLALEKAN RUFAI,

     Defendant - Appellant.

No. 12-6034

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 5:11-CR-00030-D-2)**

---

Paul Antonio Lacy, Assistant Federal Public Defender, Office of the Federal Public Defender, Oklahoma City, Oklahoma, appearing for Appellant Olalekan Rufai.

Amanda Maxfield Green, Assistant United States Attorney (Sanford C. Coats, United States Attorney, with her on the brief), Office of the United States Attorney, Oklahoma City, Oklahoma, appearing for Appellee.

---

Before **MATHESON**, **EBEL**, and **O'BRIEN**, Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

At a joint trial, a jury acquitted Olalekan Rufai and Adedayo Adegboye of one

count of conspiracy to commit health care fraud, pursuant to 18 U.S.C. § 1349, and

convicted them of five counts of aiding and abetting health care fraud, pursuant to 18

U.S.C. §§ 1347 and 2. The Government and Mr. Rufai agree that an unindicted third party, Joshua Ohaka, knowingly filed fraudulent claims on behalf of the medical equipment company set up by the Defendants. Mr. Rufai argues that the trial evidence was insufficient to show that he knowingly and willfully participated in the fraud. Exercising jurisdiction under 28 U.S.C. § 1291, we agree and reverse Mr. Rufai's convictions on all counts.

## I. **BACKGROUND**[1]

### A. *Factual Background*

This case concerns fraudulent Medicare claims filed by Joshua Ohaka through a durable medical equipment ("DME") provider called First Century Medical Supply ("First Century"). Mr. Rufai and Mr. Adegboye incorporated and set up First Century and served as First Century's legal face. Mr. Ohaka fled the country when he was

---

[1] Mr. Rufai and Mr. Adegboye were tried together. The issues they raise on appeal are similar. This background section addresses the information necessary to frame the issues in both appeals and is incorporated in the separate opinion for Mr. Adegboye's appeal. We therefore cite to the record from both appeals. We cite to the record from Mr. Rufai's case as "Rufai ROA, Vol. [volume number] at [page number]." We cite to the record from Mr. Adegboye's case as "Adegboye ROA, Vol. [volume number] at [page number]." In Mr. Rufai's case, the trial transcript is found at Rufai ROA, Vol. 2, and in Mr. Adegboye's case, the trial transcript is found at Adegboye ROA, Vol. 3. The trial transcript has its own internal pagination, independent of that in either ROA. For simplicity, we will cite to "Trial Tr.," followed by the page number from the transcript's internal pagination.

Mr. Rufai and the Government did not supply the trial exhibits until ordered to do so after oral argument. Mr. Adegboye did not present any exhibits at trial. We cite to Mr. Rufai's exhibits as "Defendant Rufai Trial Ex. # [exhibit number]." Similarly, we cite to the Government's trial exhibits as "Government Trial Ex. # [exhibit number], Aplee. Suppl. Appx. at [page number]."

indicted in federal district court in Texas in July 2009 for fraud involving another DME company, Luant and Odera ("Luant"). Mr. Rufai and Mr. Adegboye were convicted of aiding and abetting the fraudulent claims First Century billed to Medicare on behalf of five beneficiaries. Although Mr. Ohaka was not indicted in this case, the parties agree that he perpetrated the frauds at issue.

We begin with some brief background on how Medicare is billed for durable medical equipment. We then introduce the individuals involved with First Century followed by a description of Mr. Ohaka's DME companies and First Century's history, including the Government's investigation of the fraud at First Century.

1. **Medicare and Durable Medical Equipment Providers**

"Medicare is a federal insurance program which provides health benefits for elderly and disabled individuals." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 706 (10th Cir. 2006). Medicare Part A, which is not involved in this case, "provides for basic in-patient hospital services, nursing home and hospice care, and, in some instances, home health services." *Id*. Medicare Part B is a voluntary supplemental insurance program funded in part by appropriations from the federal government and in part from monthly premiums paid by individuals who choose to enroll. *See Schweiker v. McClure*, 456 U.S. 188, 189-90 (1982). Part B, which is involved in this case, provides reimbursement for "physician services, outpatient hospital care and a range of other noninstitutional services, such as ambulance services, durable medical equipment, diagnostic laboratory tests and X-rays." *United States v. Suba*, 132

-3-

F.3d 662, 665 n.3 (11th Cir. 1998).

The United States Department of Health and Human Services (HHS) administers Medicare. "HHS contracts with insurance companies (fiscal intermediaries) [and carriers] to distribute Medicare funds. The fiscal intermediary [or carrier] pays the Medicare funding to" health care providers—in this case, DME providers. *Id*. at 665. Medicare covers the reasonable costs of patient care and, through its fiscal intermediaries and carriers, determines the rates and amounts of payments that it will cover for medically necessary services. *Id.* at 665-66.

This case deals with reimbursements for two types of DME covered under Part B: power wheelchairs and power scooters. Rather than having the customer—that is, the beneficiary—pay directly for the equipment and seek reimbursement from Medicare, the DME companies, including the company in this case, may provide the equipment and then file the beneficiaries' claims with Medicare. Then Medicare, through its fiscal intermediaries, reimburses the DME providers. Medicare provides a greater reimbursement for power wheelchairs than power scooters.

2. **Cast of Characters**

The following briefly describes key individuals who were involved in this case.

a. *Mr. Ohaka*

Joshua Ohaka, a self-described medical doctor, is originally from Nigeria. He owned and/or ran a number of DME companies in Oklahoma and Texas: Optimed, Vitacare, Providence, and Luant. Although he was never listed in the ownership and

management papers for First Century, the DME company at issue in this case, Mr. Ohaka was heavily involved in its management and used it to file fraudulent Medicare claims.

b. *Mr. Rufai and Mr. Adegboye*

Mr. Rufai also is a native of Nigeria and holds passports from both Nigeria and Trinidad and Tobago ("Trinidad"). After graduating from college in economics in Nigeria, he taught high school English, commerce, economics, and science for two years. He then worked for the Nigerian Department of Education for three years, after which he started a business importing used products. In 1994, Mr. Rufai moved to Trinidad, where he worked as a security guard and opened a mini mart. In 1999, he came to New York to buy products to export to Nigeria while his wife stayed in Trinidad to run their store. In New York, he lived with a cousin, Adebola Adebayo.

Mr. Rufai met Mr. Ohaka outside a gas station in Brooklyn, New York, in 2004. In 2005 and again in 2006, Mr. Rufai and Mr. Ohaka purchased used goods that Mr. Rufai then shipped to Nigeria. In 2006 and 2007, Mr. Rufai sold three vehicles to Mr. Ohaka. Beginning in the fall of 2007, Mr. Rufai helped establish First Century and was part of the company's legal front. In 2008 and 2009, Mr. Rufai and his cousin Mr. Adebayo managed a supermarket in New York that they planned to buy with Mr. Ohaka.

Less of Mr. Adegboye's history was presented at trial. He also is from Nigeria and moved with his family to the United States after receiving a resident visa. The Adegboye family lived in the same building as Mr. Rufai and his cousin. Mr. Rufai introduced Mr. Adegboye to Mr. Ohaka in 2007. Mr. Adegboye was involved in real

-5-

estate in New York. He also helped establish and run First Century and was part of the company's legal front.

c. *Employees*

Employees moved from Mr. Ohaka's other DME companies to First Century, and employees at First Century often performed work for the other DME companies and vice versa. The following employees worked at First Century or performed work on behalf of First Century.

Tracina Pratcher started working at Vitacare on October 18, 2007. In January 2008, she moved to First Century, where she worked until late March 2008. At Vitacare, she was responsible for filling out the paperwork (a certificate of medical necessity, or "CMN") to bill Medicare. At First Century, she opened the facility, hired painters, bought office equipment, prepared for its Medicare inspection, and served as the first salesperson. She also continued to prepare CMNs for Vitacare customers.

Florida Raines worked separately at Optimed, Vitacare, Providence, and First Century, starting at Optimed in September 2007. She transferred to First Century after Ms. Pratcher left, but she quit sometime before it was approved to bill Medicare. At First Century she answered calls, paid bills, and continued preparing First Century to qualify for Medicare billing approval.

Sasha Rinker worked at Optimed for six months in 2006 and then worked at Vitacare as store manager until January 2009. As Mr. Ohaka's principal manager, she filled in at First Century when no one was there, filled out Medicare claims paperwork

that was submitted in First Century's name, and advised Mr. Adegboye of matters at First Century that he needed to address. She also performed management functions, such as making sure First Century's bills and employees were paid and that it had reapplied for its state permits.

Elizabeth Unsell managed First Century in the fall of 2008. She had been there for about two weeks when it was inspected by Medicare contractors in September 2008. She continued to work for First Century until at least November 2008, when she and Mr. Adegboye were trying to address violations discovered during the September inspection.

d. *Medicare contractors and investigators*

Gina Bertram is a fraud analyst for a company that works for the National Supplier Clearinghouse (the "NSC"). The NSC, a Medicare contractor, authorizes companies to bill Medicare for durable medical equipment and monitors the billing process. It issues Medicare billing numbers to DME companies, receives and processes the applications for approval to bill Medicare, and monitors the DME companies for fraud. Ms. Bertram reviewed the report from the NSC's September 2008 inspection of First Century, notified First Century of the violations found during the inspection, and ultimately revoked First Century's Medicare billing privileges for non-compliance.

Steven Scott Ward is a lead investigator for Health Integrity, which contracts with Medicare to investigate fraud. He investigated First Century after a routine inspection of new providers revealed that it was billing for orthotics and power mobility devices at a high rate.

-7-

### 3. **Mr. Ohaka's Other DME Providers**

Besides his involvement in First Century, Mr. Ohaka owned three DME companies in Oklahoma—Optimed, Vitacare, and Providence—and controlled another DME company in Texas. The Texas company, Luant, was registered under the name of an individual not involved in this case.

#### a. *Optimed*

Optimed's application for enrollment in Medicare was approved in 2005, allowing it to submit claims to Medicare for reimbursement. In 2006, the government began investigating Optimed because 90 percent of its claims to Medicare were filed using a special Medicare billing code called "the CR modifier." The CR modifier eliminated certain documentation requirements and allowed for faster processing of claims to replace equipment lost due to Hurricanes Katrina and Rita. Around October 2006, Medicare placed Optimed on "prepayment review," which requires that a DME company provide supporting documentation for each claim that it has submitted before Medicare will approve reimbursement. Optimed was unable to submit the required documentation for prepayment review, and the NSC revoked Optimed's identification number and its privilege to bill Medicare.

#### b. *Vitacare*

Vitacare was enrolled to bill for Medicare reimbursement in early 2007. Mr. Ohaka listed his wife as Vitacare's owner on the Medicare enrollment application. When investigators from the NSC conducted a site visit to approve Vitacare's application and

encountered Mr. Ohaka, he told them that he was the owner. Around mid-2007, Health Integrity began investigating Vitacare and noticed that it was billing with the CR modifier at a high rate. Vitacare was placed on prepayment review in the spring of 2008. Vitacare was unable to comply with the documentation requirements of prepayment review, and its Medicare billing privileges were revoked.

c. *Providence*

Providence was approved to bill Medicare in early 2008. Medicare began investigating it in July or August 2008 because Providence had been billing for orthotics at a high rate. Providence was placed on prepayment review. When it could not document several claims, its Medicare provider number was revoked.

d. *Luant*

In December 2008, Medicare conducted a site visit of Luant, Mr. Ohaka's Texas DME provider. Although Helen Etinfoh was listed on the company's Medicare application as the owner, employees told Medicare representatives that Mr. Ohaka was the owner. Medicare subsequently determined that Mr. Ohaka and Ms. Etinfoh had agreed that he would pay her in exchange for use of her name as owner on Luant's Medicare claims. Mr. Ohaka was indicted for fraud in July 2009 based on his involvement with Luant.

e. *Investigation of Mr. Ohaka's DME companies*

Mr. Ward, the Health Integrity investigator, testified that Medicare had received complaints from Medicare beneficiaries that (1) Mr. Ohaka's companies had not

delivered promised products at all, (2) products delivered were not those ordered, or (3) equipment was received that they never ordered. Because of these complaints and because of Mr. Ohaka's association with businesses that had submitted erroneous claims, Medicare began investigating all businesses in which Mr. Ohaka had an ownership or managing interest.

Mr. Ward further testified that Mr. Ohaka's use of Ms. Etinfoh as Luant's straw owner was a common Medicare fraud practice. Under this practice, the fraudulent actors "identify other individuals that they can enter into a business arrangement with and get them to . . . apply for the [Medicare billing] number or put their name down as the registered agent for operating the business when . . . [the fraudulent actors are] the ones actually operating the business behind the scenes." Trial Tr. at 51-52.

4. **History of First Century**

    a. *Starting the business*

In 2007, Mr. Rufai introduced Mr. Adegboye to Mr. Ohaka in New York. The three discussed starting a DME company in Oklahoma. Although both Mr. Rufai and Mr. Adegboye planned to fly to Oklahoma City from September 12 to September 17, 2007, to begin setting up the business, Mr. Adegboye was too busy at the last minute and Mr. Rufai went alone.

Mr. Ohaka picked up Mr. Rufai from the airport and showed him around Vitacare before taking him to the office of the Oklahoma Secretary of State to file papers setting up First Century. Mr. Rufai paid the incorporation fee, listed himself as the registered

-10-

agent of First Century Medical Supply, and signed as the incorporator. He also listed himself and Mr. Adegboye as First Century's directors. First Century was incorporated on September 12, 2007. Mr. Ohaka's name did not appear on the incorporation papers.

Mr. Rufai stayed at Mr. Ohaka's apartment in Oklahoma City and spent the rest of his time there filling out insurance paperwork for First Century, visiting Mr. Ohaka's businesses, and looking for places to purchase goods to take to Trinidad and Nigeria. On September 17, Mr. Rufai flew from Oklahoma City to Houston, where he stayed at Mr. Ohaka's home for four days.

b. *Opening bank accounts, signing service agreements, and leasing space*

On October 17, 2007, Mr. Rufai and Mr. Adegboye traveled to Oklahoma City. On October 18, they opened a Bank of America account for First Century. They listed themselves as the authorized signers on the account, with Mr. Adegboye listed as president of First Century and Mr. Rufai as vice-president. After opening the account, Mr. Adegboye emailed the account information to Mr. Ohaka and copied the email to Mr. Rufai.

Mr. Adegboye signed a service agreement, dated October 17, 2007, between Vitacare and First Century, for Vitacare to repair First Century's customers' equipment. On the same day, Mr. Adegboye signed, as owner of First Century, an agreement that First Century would purchase equipment from Vitacare. Also that day, Mr. Rufai signed a general liability insurance agreement, which Medicare requires for all DME companies.

Between November 20 and November 22, 2007, Mr. Rufai returned to Oklahoma

-11-

without Mr. Adegboye to conduct additional First Century business. Mr. Rufai and Mr. Adegboye had already begun arranging for First Century's store space, and the leasing company gave Mr. Rufai a key to inspect the premises and see what repairs needed to be made. Mr. Rufai picked up bills at the post office in Oklahoma City and gave them to Mr. Adegboye when he returned to New York. He then spent the Thanksgiving holiday in Houston with Mr. Ohaka.

The lease for First Century's space was dated December 14, 2007, but Mr. Adegboye signed and notarized it on November 15, 2007. Mr. Rufai signed as the witness to Mr. Adegboye's signatures. The lease listed Mr. Adegboye as First Century's contact person. It also listed Mr. Adegboye and Med-Links Holdings Inc. (a company Mr. Ohaka and Mr. Rufai were using to buy a supermarket) as guarantors for the rent. For the guaranty by Med-Links Holdings, Mr. Rufai signed as its director of sales, and Mr. Adegboye signed as the witness. For the personal guaranty signed by Mr. Adegboye, Mr. Rufai signed as witness.

c. *Applying to Medicare*

Ms. Pratcher was sent from Vitacare to First Century in January 2008 to open the storefront and get the store running to prepare for the inspection necessary for Medicare billing approval.

On January 8, 2008, Mr. Adegboye signed and submitted the Medicare enrollment application, which the NSC received on January 14, 2008. Section 6 of the application required First Century to list all individuals with a five percent or greater ownership, all

-12-

managing employees, anyone with a partnership interest, and authorized and delegated officials. The completed application mentioned only Mr. Adegboye. He was listed as a five percent or greater owner and managing employee. Section 14 of the application lists the possible consequences for providing false information, which include liability for executing a scheme to defraud a health care benefit program under 18 U.S.C. § 1347.

Finally, in Section 15, Mr. Adegboye certified as the authorized official for First Century that all the information in the application was correct. He also certified that (1) he would notify the NSC of any changes to the information in the application within 30 days of the change; (2) no "owner, partner, officer, director, managing employee, authorized official, or delegated official . . . is currently sanctioned, suspended, debarred, or excluded . . . from supplying services to Medicare";[2] and (3) he would "not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and [would] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." Suppl. Appx. at 61.

Sometime in January 2008, the NSC conducted a site inspection and found

---

[2] Section 3 of the Application also required that First Century indicate whether it or any of its owners had (1) in the previous ten years been suspended from participation in any federal health care program, (2) a current Medicare payment suspension under any billing number, or (3) a Medicare revocation of any Medicare billing number. By the time Mr. Adegboye filed the application, Optimed had been placed on prepayment review and had its privileges revoked. One possible motive for omitting Mr. Ohaka from the application, then, was to avoid the scrutiny that would result from Mr. Ohaka's involvement in Optimed, but there was no evidence presented that Mr. Adegboye knew about Optimed's status at that time.

paperwork and credit issues at First Century. On February 1, 2008, First Century received a letter from the NSC that identified these issues and stated that First Century could not be approved for Medicare billing because its application was incomplete. Ms. Pratcher was unable to contact Mr. Rufai about the credit issues raised in the NSC letter because he was out of the country, so she called Mr. Ohaka. He told her to go to Vitacare and get a letter stating that it was lending credit to First Century.

On February 19, 2008, Mr. Adegboye sent the additional documents to the NSC that it had requested, including an electronic funds transfer agreement for Medicare to deposit funds directly in First Century's accounts. He again signed the paperwork as the manager and authorized official for First Century.

On March 28 or 29, 2008, Ms. Pratcher resigned from First Century to move to Georgia to care for her ailing grandfather. She told Mr. Rufai, however, that she had quit because of how poorly Mr. Ohaka treated her and because things at First Century did not seem "right to [her]." Trial Tr. at 344. In particular, she was concerned about calls to First Century from Vitacare customers complaining that they had not received their equipment and about the credit letter from Vitacare to First Century, which "seemed illegal to [her]." *Id*. at 345.

On March 31, 2008, the NSC performed another site inspection of First Century. Sasha Rinker, who managed Mr. Ohaka's other stores and was there that day, told the inspector that she was the manager and that the owner had other DME companies. When the inspector asked for a list of the other locations, she called Mr. Ohaka, who told her to

-14-

say that First Century had no other locations. After receiving the inspection report, the Medicare NSC contractor who was processing the application requested that First Century update the application to include Ms. Rinker as the managing employee and, because there was so little inventory on site, that it provide evidence of inventory contract agreements.

On April 7, 2008, Mr. Adegboye updated the Medicare application by removing his status as managing employee. On April 17, 2008, he added Ms. Rinker—Vitacare's manager—as managing employee and provided additional forms.

On May 20, 2008, First Century received its approval letter from Medicare, allowing it to begin submitting claims.

First Century's original bank account was eventually closed for lack of activity. On May 30, 2008, Mr. Rufai and Mr. Adegboye opened three new accounts for First Century at Bank of America. Mr. Adegboye was again listed as president of First Century and Mr. Rufai as vice-president. They also requested debit cards to draw on the accounts.

d. *Billing Medicare*

From approximately May 2008 through September 2008, First Century submitted claims on behalf of beneficiaries to Medicare for approximately $1.2 million, for which it

received approximately $303,000.[3] Mr. Ohaka used the same process to bill Medicare at all of his DME companies. He would choose an employee at one of the companies and send her a packet of information about a Medicare beneficiary. He would instruct the employee on the billing codes to enter, such as the CR modifier, and as to which company—Vitacare, Providence, or First Century—would submit the CMN. The employee would then send the CMN to Mr. Ohaka or directly to Reliance Billing, the company Mr. Ohaka used to submit CMNs to Medicare.

e. *Inspection and Medicare investigation*

Mr. Rufai and Mr. Adegboye were rarely on site—Mr. Adegboye spent most of his time in New York, and Mr. Rufai spent most of his time in New York or abroad—but they were reachable by phone and email. Sometime during September 2008, Mr. Adegboye visited First Century in Oklahoma and paid some bills. Also in September, Ms. Unsell began working at First Century.

On September 22, 2008, the NSC conducted another inspection of First Century. For the NSC, it is a sign of fraud when a supplier submits many claims when it has little

---

[3] All of the beneficiaries for whom First Century billed Medicare lived in Louisiana or Texas, areas potentially affected by hurricanes and thus where use of the CR modifier would be less suspicious. The five counts of health care fraud for which Mr. Rufai and Mr. Adegboye were convicted related to claims filed on behalf of five of these beneficiaries. For each of them, Medicare was billed for a power wheelchair using the CR modifier for storm-related losses. Testimony at trial established that at least three of the beneficiaries did not live in areas affected by Hurricanes Katrina or Rita. At least four of them received cheaper power scooters rather than the power wheelchairs for which Medicare was billed. At least four of them had never received a physician's prescription for the equipment.

inventory. The First Century store had little inventory, and Ms. Unsell, who was managing the store at the time, could not tell the inspector if there were any contracts with another company to provide supplies. She also was unable to tell the inspector the owner's name or how First Century obtained beneficiary referrals. The inspector reported a lack of files, apart from 10 files lying unsecured on top of a desk.

On October 15, 2008, Gina Bertram, the NSC contractor employee who reviewed the inspection report, sent a deficiency letter to First Century listing the company's violations of Medicare requirements and giving First Century three weeks to show compliance.

Health Integrity, the Medicare contractor investigating Medicare fraud in Oklahoma, also opened an investigation of First Century based on Medicare's practice of monitoring new DME providers. Because First Century was a new provider that had immediately started to bill Medicare for orthotics and power mobility devices, Health Integrity put it on prepayment review around October 2008. This meant that every time First Century submitted a claim, it received a letter asking it to provide supporting documentation before Medicare would pay the claim. First Century did not provide the required documents.

On November 7, 2008, Ms. Unsell responded to the deficiency letter from NSC's Mr. Bertram with a number of documents, including a form from Mr. Adegboye designating her as a delegated official for First Century. Ms. Bertram concluded that First Century had not provided all the information the NSC had required and, on January

-17-

21, 2009, sent First Century a letter stating that the NSC had revoked First Century's Medicare supplier number.

f. *First Century's closure and post-closure investigations*

On January 4, 2009, Mr. Ohaka emailed his employees that all of the DME companies, including First Century, would be closing because of the economy.

On August 18, 2009, attorneys for Mr. Adegboye sent a letter to the FBI requesting the return of First Century records that had been taken when FBI agents seized Luant's company records. Sometime before, Medicare had asked First Century to produce records for post-payment review of numerous claims. The letter from Mr. Adegboye's attorneys to the FBI stated that Medicare had requested the records to verify services that had been billed. The letter reported that the records had been "given to Mr. Ohaka for safe keeping when Mr. Adegboye was in the process of relocating to New York since Mr. Ohaka said he was coming to New York at a later date." Government Trial Ex. # 5A, Aplee. Suppl. Appx. at 246; Trial Tr. at 63. The letter further stated that Mr. Ohaka had been unable to travel to New York to deliver the records because he had been indicted.

On October 5, 2009, Medicare investigators received a notarized affidavit from Mr. Adegboye explaining why he was unable to produce the requested documents. He stated that he owned First Century and that he had earlier decided to move the "company back to New York." Government Trial Ex. # 5B, Aplee. Suppl. Appx. at 248. He explained that he had "contacted a long time friend, who also runs a similar business in

-18-

Oklahoma by the name [of] Dr. Joshua Ohaka and requested him to help me box the files and other office equipments and ship them to me in New York. . . . [Mr.] Ohaka resides in Houston, Texas, so he moved the documents to Texas for onward mailing to New York." *Id.* He further explained that he had learned that the FBI seized the files when Mr. Ohaka was indicted and that he had been unable to get the files back from the FBI.

### B. *Procedural Background*

#### 1. **Indictment**

On January 18, 2011, the Government filed a six-count indictment against Mr. Rufai and Mr. Adegboye. Count One charged them with conspiring to commit health care fraud in violation of 18 U.S.C. § 1349. Counts Two to Six charged them with health care fraud in violation of 18 U.S.C. § 1347 and of aiding and abetting Mr. Ohaka in health care fraud in violation of 18 U.S.C. § 2. Each of the five counts related to a request for Medicare reimbursement filed by First Century for equipment provided to a different beneficiary. A superseding indictment was entered on June 22, 2011, enlarging the time frame for the conspiracy in Count One and the dollar amount in Count Two.

#### 2. **Trial**

Trial began on August 8, 2011. At the close of the Government's case, Mr. Adegboye moved under Rule 29 of the Federal Rules of Criminal Procedure for judgment of acquittal, arguing that the Government had not established mens rea—the knowing or willful participation of Mr. Adegboye.

-19-

Mr. Rufai also moved for judgment of acquittal pursuant to Rule 29. He joined Mr. Adegboye's mens rea arguments on Count One. On Counts Two through Six, he argued that the Government failed to show that he executed any scheme. He then asked that the court dismiss the indictment insofar as it charged him in Counts Two to Six as a principal and that the case proceed to the jury only on the aiding and abetting theory for those counts.[4]

The district court denied the motions, noting that it had to view the evidence in the light most favorable to the Government and that "[j]udgment of acquittal is proper only if the evidence and inferences therefrom are insufficient to permit a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." Trial Tr. at 801.

In his case-in-chief, Mr. Adegboye did not present evidence. Mr. Rufai, on the other hand, testified and called his cousin, Mr. Adebayo, as a witness.

While deliberating, the jury sent the court two questions. The first question dealt with jury instruction 25, which stated that the jury could find a defendant guilty of Counts Two to Six if it found that defendant guilty of the conspiracy charge (Count One) and found beyond a reasonable doubt that another member of the conspiracy committed the offenses in Counts Two to Six. The jury asked if a defendant could be guilty of conspiracy (Count One) but not fraud (Counts Two to Six) and vice versa. The district court responded that the Government must prove conspiracy beyond a reasonable doubt

---

[4] We note that Mr. Rufai did not argue for judgment of acquittal on the aiding and abetting theory of liability for Counts Two to Six.

and the jury must acquit a defendant of conspiracy if the Government had not done so. It also told the jury that it did not have to find a defendant guilty of Count One to find him guilty of Counts Two to Six. The jury had to consider whether the Government had met its burden with respect to each count.

The jury subsequently asked the court about the legal responsibilities of those signing a business's incorporation documents and Medicare applications. The court responded that the Defendants had not been charged "with crimes based solely on the execution of corporation formation documents or the Medicare application," and that the jury was "to consider only the crimes charged in the Superseding Indictment." Adegboye ROA, Vol. I at 60.

On August 17, 2011, the jury acquitted Mr. Rufai and Mr. Adegboye on Count One but found them guilty on Counts Two to Six.

3. **Post-Trial Motions for Acquittal or for New Trial**

Mr. Rufai did not renew his motion for judgment of acquittal. Mr. Adegboye filed motions for judgment of acquittal under Rule 29 or for a new trial under Rule 33. As to the former, he argued that the only evidence of knowledge or intent was his failure to identify Mr. Ohaka's role at First Century in the Medicare application and updates, which raises only a suspicion of guilt. As to the motion for a new trial, he argued that the jury's guilty verdict on the health care fraud charges was inconsistent with its acquittal on the conspiracy charge and that the guilty verdict could have resulted only from a mistake of law.

-21-

On October 13, 2011, the district court denied both motions.

4. **Sentencing**

On January 25, 2012, the district court sentenced Mr. Rufai and Mr. Adegboye to 12 months and 1 day in prison for each of Counts Two to Six, to be served concurrently. They also were sentenced to two years of supervised release and ordered to pay a $500 special assessment and $299,624 in restitution. They are jointly and severally liable for the restitution.

## II. DISCUSSION

On appeal, Mr. Rufai argues that the Government presented insufficient evidence to prove beyond a reasonable doubt that he committed health care fraud as a principal or as an aider and abettor. The Government does not contend that he is guilty as a principal, so we focus on whether there was sufficient evidence to convict him for aiding and abetting health care fraud.

### A. *Standard of Review*

1. **The Reasonable Jury Standard**

"We review . . . the sufficiency of the evidence to support a conviction or the denial of a defendant's motion for judgment of acquittal de novo." *United States v. Apperson*, 441 F.3d 1162, 1209 (10th Cir. 2006) (quotations omitted). We "tak[e] the evidence—both direct and circumstantial," and reasonable inferences drawn from that evidence—"in the light most favorable to the government" and ask "only whether . . . a reasonable jury could find [the defendant] guilty beyond a reasonable doubt." *United*

-22-

*States v. Kaufman*, 546 F.3d 1242, 1263 (10th Cir. 2008) (quotations omitted); *see also*

*United States v. Dobbs*, 629 F.3d 1199, 1203 (10th Cir. 2011). "[W]e may not weigh

evidence or consider credibility of witnesses." *United States v. Renteria*, 720 F.3d 1245,

1253 (10th Cir. 2013); *see also United States v. Cui Qin Zhang*, 458 F.3d 1126, 1128

(10th Cir. 2006). "[T]he evidence, together with the reasonable inferences to be drawn

therefrom, must be substantial, but it need not conclusively exclude every other

reasonable hypothesis and it need not negate all possibilities except guilt." *United States

v. MacKay,* 715 F.3d 807, 812 (10th Cir. 2013) (quotations omitted).

Nevertheless, "[w]e will not uphold a conviction . . . that was obtained by nothing

more than piling inference upon inference . . . or where the evidence raises no more than

a mere suspicion of guilt." *United States v. Rahseparian*, 231 F.3d 1257, 1262 (10th Cir.

2000) (citations omitted) (quotations omitted). "[R]easonable inferences supported by

other reasonable inferences . . . may warrant a conviction," but "[a] jury will not be

allowed to engage in a degree of speculation and conjecture that renders its finding a

guess or mere possibility." *United States v. Michel*, 446 F.3d 1122, 1127-28 (10th Cir.

2006) (quotations omitted).

2. **The Reasonable Jury and Proof beyond a Reasonable Doubt**

The key parts of our sufficiency-of-the-evidence standard of review are (1)

whether a reasonable jury *could* find guilt (2) beyond a reasonable doubt. The first sets a

high bar for a defendant challenging a criminal conviction on appeal. The second

recognizes the prosecution's high burden to prove its case. Both are critical to our

-23-

review.

An appellate court must consider the burden of proof in its sufficiency-of-the-evidence analysis. The test is not whether *some* evidence could have reasonably supported a guilty verdict, but whether a rational jury could have found each element of a crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).[5] The test is not whether a rational jury could decide that guilt was more likely than not, but beyond a reasonable doubt.[6] The evidence "must be substantial, raising more than a mere suspicion of guilt." *United States v. Smith*, 133 F.3d 737, 742 (10th Cir. 1997).

As explained below, the issue here is not whether Mr. Rufai aided Mr. Ohaka's fraud, but whether he knew he was doing so.[7] The government's case was weak, but not bereft of circumstantial evidence. We must reconcile the highly deferential "reasonable jury *could* find" appellate review standard with the "beyond a reasonable doubt" standard. Compounding our challenge is the substantial evidence that Mr. Ohaka committed Medicare fraud combined with the weak evidence of Mr. Rufai's knowledge,

---

[5] "[T]he critical inquiry on [appellate] review of the sufficiency of the evidence to support a criminal conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 318-19.

[6] Charles Allen Wright said over 50 years ago that "federal courts do not seem ever to have distinguished between civil and criminal cases in considering appellate power to order a new trial." Charles Alan Wright, *The Doubtful Omniscience of Appellate Courts*, 41 Minn. L. Rev. 751, 761 n.47 (1957). Whether or not that observation applies today, it is useful admonition.

[7] Although "[t]he standard for finding that a defendant aided or abetted a crime is not a high one," *United States v. Burks*, 678 F.3d 1190, 1198 (10th Cir. 2012), proof of knowledge often requires, as here, an inference from circumstantial evidence.

posing a risk of imputing knowledge to him from the strong evidence of wrongdoing by non-defendant Ohaka.

### 3. **Sufficiency of the Evidence and Plain Error Review**

Mr. Rufai failed to raise the mens rea argument as to the aiding and abetting theory of liability on the health care fraud charges in his Rule 29 motion, and he failed to renew the Rule 29 motion altogether after the close of evidence. When a defendant does "not raise [a] specific argument in his Rule 29 motion," *United States v. DeChristopher*, 695 F.3d 1082, 1091 (10th Cir. 2012), or fails to renew the motion after introducing evidence in his own defense, *see United States v. Flanders*, 491 F.3d 1197, 1208 (10th Cir. 2007), we review only for plain error.

> To establish plain error, [the appellant] must demonstrate the district court (1) committed error, (2) the error was plain, and (3) the plain error affected her substantial rights. If these factors are met, we may exercise discretion to correct the error if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Story*, 635 F.3d 1241, 1244 (10th Cir. 2011) (citations omitted).

"[A] conviction in the absence of sufficient evidence of guilt," however, almost always meets the first three factors of plain error review. *Kaufman*, 546 F.3d at 1263. Moreover, it is only in a rare case when the absence of sufficient evidence will not meet the fourth factor of plain error review. *See United States v. Goode*, 483 F.3d 676, 682 (10th Cir. 2007). Thus, "review under the plain error standard in this case and a review of sufficiency of the evidence usually amount to largely the same exercise." *United*

*States v. Duran*, 133 F.3d 1324, 1335 n.9 (10th Cir. 1998); *see also Goode*, 483 F.3d at 681 n.1.

## B. *Legal Background*

### 1. **Health Care Fraud**

Title 18, section 1347 of the United States Code states that it is a crime to

> knowingly and willfully execute[], or attempt[] to execute, a scheme or artifice--
> > (1) to defraud any health care benefit program; or
> > (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
> in connection with the delivery of or payment for health care benefits, items, or services.

18 U.S.C. § 1347(a); *see also United States v. Franklin-El*, 555 F.3d 1115, 1122 (10th Cir. 2009). Thus, to establish health care fraud under § 1347, the Government must prove beyond a reasonable doubt that the defendant (1) "devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud," *United States v. Jones*, 641 F.3d 706, 710 (6th Cir. 2011) (quotations omitted); (3) acted knowingly and willfully with the "intent to defraud," *id.* (quotations omitted); and (4) the scheme to defraud employed "false pretenses, representations, or promises," *Franklin-El*, 555 F.3d at 1122. To establish that a defendant knowingly and willfully acted with intent to defraud, "the Government must

-26-

prove that the defendant acted with knowledge that his conduct was unlawful." *Id.* (quotations omitted).

## 2. **Aiding and Abetting Health Care Fraud**

The focus of this appeal is whether the evidence was sufficient to convict Mr. Rufai of aiding and abetting health care fraud. "Whoever . . . aids, abets, counsels, commands, induces or procures [the] commission [of an offense against the United States] is punishable as a principal." 18 U.S.C. § 2. "[T]o aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, [and] that he seek by his action to make it succeed.'" *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2nd Cir. 1938)).

The Government must first "prove that someone committed the underlying substantive offense." *United States v. Self*, 2 F.3d 1071, 1088 (10th Cir. 1993); *see also United States v. Cooper*, 375 F.3d 1041, 1049 (10th Cir. 2004). Second, the Government must prove that the defendant "(1) willfully associated with the charged criminal venture and (2) aided the venture through affirmative action." *United States v. Summers*, 414 F.3d 1287, 1295 (10th Cir. 2005); *see also United States v. Rosalez*, 711 F.3d 1194, 1205 (10th Cir. 2013); *United States v. Bowen*, 527 F.3d 1065, 1078 (10th Cir. 2008); *United States v. Anderson*, 189 F.3d 1201, 1207 (10th Cir. 1999).

"Liability as an aider and abett[o]r is based . . . on the *act* of intentionally counseling, aiding, or assisting another in the commission of a crime." *Bowen*, 527 F.3d

at 1077 n.10; *see also Nye*, 336 U.S. at 620. "One need not participate in an important aspect of a crime to be liable as an aider and abett[o]r; participation of relatively slight moment is sufficient. Even mere words or gestures of encouragement constitute affirmative acts capable of rendering one liable under this theory." *Bowen*, 527 F.3d at 1078 (citations omitted) (quotations omitted). There is no need for "actual communication between an aider and abettor and the principal" or for "the aider and abettor [to] know by whom the crime is actually perpetrated." *White v. United States*, 366 F.2d 474, 476 (10th Cir. 1966).

Nevertheless, the Government must make "some showing of intent to further the criminal venture." *United States v. Delgado-Uribe*, 363 F.3d 1077, 1084 (10th Cir. 2004). "[A] defendant may not stumble into aiding and abetting liability by inadvertently helping another in a criminal scheme unknown to the defendant." *United States v. Jones*, 44 F.3d 860, 869 (10th Cir. 1995) (quotations omitted). Even "presence at the scene of the crime" or "knowledge that [a] crime is being committed" is insufficient. *Id.* "[T]o be convicted of aiding and abetting, a defendant must share in the intent to commit the underlying offense." *United States v. Willis*, 476 F.3d 1121, 1125 (10th Cir. 2007) (quotations omitted). "[W]e have repeatedly held that circumstantial evidence may support a jury's reasonable inference of guilty knowledge by the defendant." *Rahseparian*, 231 F.3d at 1262.

C. *Sufficiency of the Evidence against Mr. Rufai*

Mr. Rufai does not challenge the Government's contentions that Mr. Ohaka committed health care fraud through First Century, that he was associated with First Century, or that his acts contributed to the health care fraud. He challenges only whether the Government presented sufficient evidence for a rational jury to conclude beyond a reasonable doubt that he knowingly and willfully aided the fraudulent scheme.

1. **Assistance in Committing the Fraud at First Century—Actus Reus of Aiding and Abetting**

Although Mr. Rufai does not challenge that fraud occurred at First Century or that his actions aided the fraud, we briefly review the evidence of his and Mr. Adegboye's actions to provide foundation for our discussion of whether the Government proved his knowledge of and intent to aid the fraud.

By the time Messrs. Ohaka, Rufai, and Adegboye agreed to form First Century in September 2007, Medicare had begun suspending Mr. Ohaka's right to bill Medicare at his other businesses. Such suspensions normally trigger review of related businesses that bill Medicare. Mr. Ohaka had already set up straw owner schemes at Vitacare and Luant when he approached Messrs. Rufai and Adegboye to set up First Century.[8]

Messrs. Adegboye and Rufai provided the legal front for the business. Mr. Rufai incorporated First Century, listing only himself as an incorporator and only himself and

---

[8] There is no direct evidence in the record that Messrs. Rufai and Adegboye knew of the other straw owner schemes or of the suspensions of Mr. Ohaka's other businesses.

Mr. Adegboye as directors on the incorporation forms. Mr. Adegboye applied for a Medicare billing number and for authorization to bill Medicare, listing only himself as owner and managing employee. Mr. Adegboye and Mr. Rufai also opened bank accounts in October 2007 and May 2008 for First Century and indicated that Mr. Adegboye was president and that Mr. Rufai was vice-president of the company. They were the only people with authority to transfer or withdraw money from the accounts.

Between Medicare approval in May 2008 and early September 2008, the record does not indicate that Mr. Adegboye or Mr. Rufai visited First Century or even that an employee was working there. During that time, Mr. Ohaka submitted fraudulent Medicare claims using First Century's billing number, including the claims charged in this case. The First Century bank accounts received the Medicare reimbursements for the fraudulent claims Mr. Ohaka submitted. From New York, Mr. Adegboye used this money to pay for the rent, employee salaries, and other expenses for Mr. Ohaka's companies, including First Century.

In short, the Government proved that Mr. Rufai and Mr. Adegboye "aided the [criminal] venture through affirmative action," *Summers*, 414 F.3d at 1295, the actus reus element of aiding and abetting. We now turn to the mens rea element, whether they "willfully associated with the charged criminal venture." *Id*.

2. **Knowingly and Willfully Aiding the Fraud—Mens Rea of Aiding and Abetting**

Short of incriminating statements from a defendant, proof of knowledge and intent must be based on drawing inferences from the defendant's actions, the testimony and

actions of others, and documentary evidence. That is what the Government attempted to do in this case. Largely through testimony from First Century employees, Medicare investigators, and documents, the Government tried to present Mr. Rufai's and Mr. Adegboye's activities on behalf of First Century against the backdrop of Mr. Ohaka's and First Century's fraudulent Medicare billing. The Government urged the jury to infer the Defendants' knowledge and intent to defraud Medicare from the totality of the evidence.

Mr. Rufai concedes that Mr. Ohaka executed a fraudulent Medicare billing scheme at First Century, and he does not dispute that his actions contributed to health care fraud. He argues there was insufficient evidence to establish beyond a reasonable doubt that he knowingly involved himself in the scheme to defraud Medicare.

We already have reviewed the evidence of the fraud at First Century and of Mr. Adegboye's and Mr. Rufai's actions that assisted the fraudulent scheme. We therefore turn to the evidence of Mr. Rufai's knowledge of the Medicare fraud at First Century and his intent to participate in it. There is no direct evidence of Mr. Rufai's knowledge of the fraudulent scheme or of his intent to participate, but a jury may make reasonable inferences of knowledge and intent from circumstantial evidence. *See Rahseparian*, 231 F.3d at 1262. Nevertheless, "inferences may become so attenuated from underlying evidence as to cast doubt on the trier of fact's ultimate conclusion." *Michel*, 446 F.3d at 1128 (quotations omitted). In such a case, a guilty verdict indicates that the jury has impermissibly "engage[d] in a degree of speculation and conjecture that renders its finding a guess or mere possibility." *Jones*, 44 F.3d at 865 (quotations omitted).

a. *Relationships*

Mr. Rufai had a longer history with Mr. Ohaka than Mr. Adegboye. Mr. Rufai introduced Mr. Adegboye to Mr. Ohaka. He had other business dealings with Mr. Ohaka and spent time at Mr. Ohaka's home. One example of their multiple business relationships was evidence that when Mr. Ohaka's company, Med-Links, acted as guarantor for First Century's rent, Mr. Rufai acted as the authorized official for Med-Links by signing the guaranty on its behalf. The Government argues that, based on their business dealings and the time that Mr. Rufai and Mr. Ohaka spent together, a reasonable jury could have inferred that Mr. Rufai had knowledge of the health care fraud scheme. The Government attempts to push the evidence too far.

In the conspiracy context, we "have warned that courts must be careful to guard against guilt by association." *United States v. Fleming*, 667 F.3d 1098, 1105 (10th Cir. 2011) (quotations omitted). Similarly, in the aiding and abetting context, we have held that "[t]he government must prove . . . more than mere presence at the scene of the crime even if coupled with knowledge that the crime is being committed." *Jones*, 44 F.3d at 869. The Government has failed to demonstrate that Mr. Rufai was exposed to any criminal activity during his interactions with Mr. Ohaka, much less that he knew illegal activity was taking place at First Century. Although his association with someone who is unquestionably guilty might suggest that Mr. Rufai knew of the fraudulent scheme, that evidence alone would not be sufficient. *See United States v. Austin*, 786 F.2d 986, 988 (10th Cir. 1986) ("evidence that only places the defendant in a climate of activity that

-32-

reeks of something foul" is insufficient to demonstrate criminal knowledge (quotations omitted)).

b. *Straw owner scheme*

Mr. Rufai assisted in setting up the straw owner scheme. He filled out the articles of incorporation and insurance paperwork, opened bank accounts, and assisted in leasing First Century's storefront. At no point did he indicate in these documents that Mr. Ohaka had a role in running First Century.

Mr. Rufai's actions in setting up the straw owner operation were consistent with setting up a legitimate business without mentioning a partner who wishes to remain anonymous and silent. The Government presented no evidence that Mr. Rufai interacted with Medicare, such as Mr. Adegboye's preparation of the Medicare application. The straw owner evidence does not show that Mr. Rufai knew that Mr. Ohaka was planning to or did submit false bills for Medicare reimbursement. The Government conceded at oral argument that Mr. Rufai's last trip to Oklahoma for which there is evidence in the record was in November 2007. He was never on site when First Century was billing Medicare.

c. *Ms. Pratcher's testimony*

The Government relies on Ms. Pratcher's testimony that she expressed suspicion about Mr. Ohaka to Mr. Rufai several months before First Century was approved to bill Medicare. It argues that this testimony shows that Mr. Rufai was on notice about the fraudulent billing scheme. But this stretches Ms. Pratcher's testimony too far. When Ms. Pratcher was at Vitacare and at First Century, she received calls from Vitacare customers

saying they had not received their equipment. She told Mr. Rufai about the calls, and he said he would speak with Mr. Ohaka about it and instructed her to apologize to the customers. The Government contends that this supports an inference that Mr. Rufai knew of a scheme that involved Medicare fraud. Although the evidence showed that Mr. Rufai knew that First Century's billing was dependent on Medicare,[9] Ms. Pratcher's testimony shows only that he knew Mr. Ohaka's Vitacare customers were complaining about not receiving their orders.

For Ms. Pratcher's statements about Vitacare customer complaints to have put Mr. Rufai on notice of Medicare fraud at First Century would require the following. He would have had to conclude that the Vitacare customers' equipment was not just delayed but was not being delivered at all; that failure to deliver the equipment was deliberate rather than inadvertent or a result of incompetence; that Medicare had been billed for the equipment; and that the customer calls were not isolated incidents. He would then need to have concluded that the same occurrences would happen at First Century. Factfinder inferences that Mr. Rufai knew (1) that Medicare fraud was occurring at Vitacare and (2) that it would occur later at First Century are attenuated, speculative, and pile inference upon inference.

Ms. Pratcher's testimony that she told Mr. Rufai about her concerns that Mr.

---

[9] Mr. Rufai was calling nearly every day to see if Medicare had called about First Century's application, and he and Mr. Adegboye did not bother to maintain a bank account for billings until First Century was approved by Medicare.

Ohaka had asked her to put her name on some tax forms similarly fails to support an inference that Mr. Rufai knew of Medicare fraud. The conversation may have put Mr. Rufai on notice of tax misconduct, but that is not a link to knowledge of health care fraud.

The Government also pointed to inventory issues to argue that Mr. Rufai was on notice of the fraud. To pass the initial Medicare inspection, site inspectors have to find adequate inventory in the store. Ms. Pratcher testified that she called and spoke with Mr. Rufai about the lack of inventory and that he told her to speak with Mr. Ohaka. Ms. Pratcher's grandfather had recently moved to Georgia, and Mr. Ohaka had asked her to put her grandfather's used wheelchair and toilet in the store.

The problem with the Government's inventory theory is that the evidence did not show that Ms. Pratcher told Mr. Rufai about the used inventory. Moreover, even if Mr. Rufai had known about the used inventory, and thus about Mr. Ohaka's willingness to deceive Medicare to get Medicare billing approval, a jury would still need to infer that Mr. Rufai knew that Mr. Ohaka would begin submitting false Medicare claims several months later.

Ms. Pratcher's testimony about her conversations with Mr. Rufai may have been enough to suggest to him that something was amiss with Mr. Ohaka and First Century, but they predated and did not forecast fraudulent billing. Her testimony does not support the string of inferences the Government urges in this case.

d. *Totality of the circumstances*

"[S]ufficiency of the evidence determinations are made by assessing the totality of the circumstances in the individual case." *Torres v. Mullin*, 317 F.3d 1145, 1164 (10th Cir. 2003). Reliance on evidence of Mr. Rufai's relationship with Mr. Ohaka runs the risk of impermissible guilt by association. The straw owner and notice arguments pile inference upon inference to the point that "the evidence raises no more than a mere suspicion of guilt." *Rahseparian*, 231 F.3d at 1262 (quotations omitted). The evidence here cannot sustain beyond a reasonable doubt the conclusion that Mr. Rufai had knowledge of the health care fraud scheme and therefore intended to participate in it.

The Supreme Court has recognized "the imperative duty of a court to see that all the elements of [a defendant's] crime are proved, or at least that testimony is offered which justifies a jury in finding those elements." *Clyatt v. United States*, 197 U.S. 207, 222 (1905); *see also United States v. Delgado*, 672 F.3d 320, 351 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 525 (2012). Mr. Rufai argues that the district court's failure to recognize the insufficient evidence of health care fraud at First Century was plain error. As discussed above, "a conviction in the absence of sufficient evidence" almost always satisfies the first three factors of plain error review. *Kaufman*, 546 F.3d at 1263. Moreover, although the standard for the fourth factor is "formidable," *United States v. Trujillo-Terrazas*, 405 F.3d 814, 820 (10th Cir. 2005), it is only in the rare case that insufficient evidence for a conviction will not meet that requirement, *see Goode*, 483 F.3d at 682.

This case is not one of those rare cases like *Goode*. Mr. Goode was charged with being a felon in possession of a firearm, *id.* at 678, which requires proof of "possess[ing] in or affecting commerce[] any firearm," 18 U.S.C. 922(g)(9). The weapon was discovered in Mr. Goode's possession in New Mexico. *Goode*, 483 F.3d at 678. It had been made in Spain. *Id.* The district court instructed the jury that the government had to prove that the firearm had moved from one state to another. *Id.* at 679. On appeal, Mr. Goode argued that the district court had narrowed the "in or affecting commerce" requirement to movement from one state to another and that there was no evidence of such movement—the weapon could have crossed the international border into New Mexico and never traveled from another state. *Id.* at 680; *see United States v. Williams*, 376 F.3d 1048, 1051 (10th Cir. 2004) ("The law of the case is applied to hold the government to the burden of proving each element of a crime as set out in a jury instruction to which it failed to object, even if the unchallenged jury instruction goes beyond the criminal statute's requirements.").

We held that, had the objection been properly made at trial, the district court could have altered the jury instruction to include traveling in foreign commerce. *Goode*, 483 F.3d at 682. Because the weapon had come from Spain, "it [was] a certainty that the firearm had traveled in foreign commerce," which would meet the statutory requirement "that Mr. Goode's possession was 'in or affecting commerce,' as charged in the indictment." *Id.* There was, therefore, "no basis for concluding that the error seriously affected the fairness, integrity or public reputation of judicial proceedings." *Id.*

-37-

Unlike in *Goode*, the evidence in this case was insufficient to demonstrate beyond a reasonable doubt one of the essential elements of the crime with which Mr. Rufai was charged. Thus, under "the facts of [this] particular case," Mr. Rufai's conviction in the absence of sufficient evidence is "particularly egregious" and the "failure to notice the error would result in a miscarriage of justice." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 736 (10th Cir. 2005) (quotations omitted).

We therefore conclude that Mr. Rufai's convictions in the absence of sufficient evidence was plain error, and we reverse.

e. *Jury confusion*

Because we reverse based on insufficiency of the evidence, we need not reach Mr. Rufai's argument that the jury could only have found him guilty because it was confused by the jury instructions as to conspiracy and fraud.

## III. **CONCLUSION**

For the foregoing reasons, we reverse Mr. Rufai's convictions for health care fraud.