UNITED STATES of America,
Plaintiff-Appellee,

v.

John Scott KILLIP a/k/a "Little Wolf," Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Johnnie Lee ADAMS a/k/a "Squirrel," Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

James Sam MARR a/k/a "Sampson," Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Virgil Earl NELSON a/k/a "Arlo," Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Marcel TEAGUE a/k/a "Tramp," Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Ronald Dale KROUT a/k/a "Krout," Defendant-Appellant.

Nos. 85–1836 to 85–1839, 85–1882 and 85–2284.

United States Court of Appeals, Tenth Circuit.

June 1, 1987.

Susan M. Otto, Asst. Federal Public Defender (David Booth, Federal Public Defender, with her on the briefs), Oklahoma City, Okl., arguing separately for each defendant-appellant.

Arlene Joplin, Asst. U.S. Atty., for plaintiff-appellee in case numbers 85–1836, 85–1839, and 85–1882.

Ted A. Richardson, Asst. U.S. Atty., for plaintiff-appellee in case numbers 85–1837, 85–1838, and 85–2284 (William S. Price, U.S. Atty., and Ted A. Richardson, Asst. U.S. Atty., Western District of Oklahoma, on all briefs of plaintiff-appellee).

Before McKAY, REINHARDT[*] and BALDOCK, Circuit Judges.

McKAY, Circuit Judge.

On February 6, 1985, John Scott Killip, Johnnie Lee Adams, Donald Edward Carrall, Jr., Ronald Dale Krout, James Sam Marr, Virgil Earl Nelson, Steven Allan

Pfaff and Marcel Teague were indicted in the Western District of Oklahoma. Count one of the indictment charged Messrs. Killip, Adams, Krout, Nelson, Pfaff and Teague with violations of the substantive provisions of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (1982 & Supp. III 1985) (RICO). The Government alleged that each defendant, as a past or present member of the Oklahoma City chapter of the Outlaws Motorcycle Club, was associated with an enterprise, the conduct of which affected interstate commerce, and charged each defendant with engaging in the affairs of an enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(1)(A), (B) & (D). The Government specifically identified seven predicate acts that allegedly showed a pattern of racketeering:

1. The Oklahoma drug conspiracy—a conspiracy during January and February of 1980 to distribute drugs in the Western District of Oklahoma;

2. The Belleville drug transactions—travel between Oklahoma City, Oklahoma and Belleville, Illinois between November 1980 and March 1981 with the intent to engage in drug trafficking;

3. Possession of drugs—possession with intent to distribute on July 29, 1981, in Oklahoma City.

4. The Florida drug transactions—travel from Oklahoma City, Oklahoma to Tampa, Florida; Orlando, Florida; and Atlanta, Georgia during March and April of 1982 with the intent to engage in drug trafficking;

5. The Ardmore kidnapping—kidnapping of a victim on April 11, 1982, at a place near Ardmore, Oklahoma;

6. The Fort Smith incident—an arrest at Fort Smith, Arkansas in October 1982 when traveling from Oklahoma City, Oklahoma towards Memphis, Tennessee with money obtained from the sale of controlled substances; and

---

[*] Honorable Stephen R. Reinhardt, Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

7. Arson—attempted arson on March 10, 1983, on a house located at 700 S.E. 21st Street in Oklahoma City, Oklahoma.

The Government alleged that Messrs. Killip, Adams, Nelson and Teague participated in the Oklahoma drug conspiracy; that Mr. Killip and Mr. Teague were involved in the Belleville transactions; that Mr. Pfaff possessed LSD in Oklahoma City; that Mr. Killip and Mr. Krout engaged in the Florida drug transactions; that Messrs. Killip, Adams, Nelson, Krout and Pfaff participated in the kidnapping; that Mr. Killip and Mr. Krout were guilty of drug trafficking in the Fort Smith incident; and that Mr. Adams attempted to commit arson on the house in Oklahoma City.

In count two, the same defendants were charged with conspiracy to violate substantive RICO provisions. The Government incorporated the predicate acts alleged in count one and recited numerous other overt acts that showed the conspiracy. In count three the Government charged Mr. Carrall and Mr. Marr with engaging in a conspiracy to distribute drugs. These charges were based on Mr. Carrall's and Mr. Marr's participation in distribution of drugs by members of the Oklahoma City chapter of the Outlaws Motorcycle Club.

Before trial, Mr. Carrall moved for a separate trial under Fed.R.Crim.P. 14, claiming that a joint trial would prejudice his defense. The trial court denied Mr. Carrall's motion, and Mr. Carrall pleaded guilty. The remaining defendants proceeded to a jury trial.

The jury returned its verdicts on April 18, 1985. It found Messrs. Killip, Adams and Nelson guilty of the substantive RICO violations and Messrs. Krout, Pfaff and Teague not guilty. On the RICO conspiracy charges the jury found Messrs. Killip, Adams, Krout, Nelson, Pfaff and Teague guilty, and on the drug conspiracy charges it found Mr. Marr guilty. The district court entered judgment on the jury verdict

and sentenced each of the defendants. Each appealed to this court.[1]

## I. *Facts*

All defendants either are, or were, members of the Oklahoma City chapter of the Outlaws Motorcycle Club. This club is an international association comprised of local chapters in the United States and Canada, although the members refer to the overall association as a national club. The local chapters are divided into six regions; thus each member is a part of a local chapter as well as a regional and a national organization. Officers at the national, regional and local levels are chosen from the membership of the club.

The national club has a constitution that sets forth prerequisites for becoming a member, gives directions for conduct of members and provides for disengagement of members in both good and bad standing. The constitution also permits local chapters to adopt their own guidelines. Thus, the national guidelines are supplemented by local bylaws from each chapter.

Becoming a member of the Outlaws involves a three-stage process. First, a prospective member associates himself with the club by becoming a "hangaround" at a local chapter. A hangaround attends chapter parties and must follow all orders given by members. However, he is not permitted to participate in any club meetings and, in fact, is not allowed in the club house during meetings.

A hangaround starts on the track to full patchwearing membership by obtaining the sponsorship of a member. He then becomes a "probate." A probate, like a hangaround, attends chapter parties, follows members' orders and is not allowed to participate in club meetings. Unlike a hangaround, however, a probate may wear a probationary Outlaw patch and knows that he is on the track to membership.

After serving his probationary period, a period determined by the local chapter, a

---

1. We did not hear oral arguments in Mr. Pfaff's case and thus delay disposition of his case until oral arguments have been heard. Although docketed and processed as companion cases, we have concluded to order them consolidated (except for Mr. Pfaff's appeal) for purposes of opinion and disposition.

probate will be considered for full patch-wearing membership. The patchwearing members of the local chapter vote on a probate's admission to the club, and will admit him only if the full patchwearing membership votes unanimously to accept him as a member. Once a member, he has all rights, privileges and responsibilities of a patchwearing member.

Each member of the Outlaws is required to attend national runs, to attend funerals and to pay monthly dues. Failure to attend any mandatory run or funeral results in a $100 fine, half of which is payable to the national organization and half of which is payable to the local chapter. If a member fails to pay fines or monthly dues, the chapter can require him to relinquish the title to his motorcycle. Continued delinquencies result in the sale of the motorcycle. Because membership in the club requires ownership of a motorcycle (American-made), a member whose motorcycle is sold is demoted to probate status.

While the national or regional levels of the club sponsor runs, local chapters frequently sponsor parties to increase the camaraderie of members and to encourage others to join the club. Members, probates and hangarounds always attend these parties. In addition, members may invite other guests. Typically the parties are held in secluded areas to avoid interference from outsiders. Security guards are positioned at the perimeter of the party to watch for uninvited guests and to insure that no one leaves until the party is over—usually the next morning. When party-goers do leave, they go a few at a time to avoid attracting attention. The waiting requirement also protects a guest who has consumed large portions of alcohol and other drugs at the party from the dangers associated with riding a motorcycle while under the influence.

Before a local chapter is admitted to the Outlaws Motorcycle Club, it must serve a probationary period. Messrs. Killip, Nelson, Carrall and four other men formed the Oklahoma City probationary chapter in 1979, and it received its charter at a national run on October 31, 1979, after meeting all the requirements set forth in the national constitution. It is the activities of the Oklahoma City chapter and its individual members that form the basis for the seven predicate acts that the Government claims support the defendants' convictions. We must review whether the evidence is sufficient to establish these predicate acts in a light most favorable to the Government, and "all reasonable inferences and credibility choices must be made in support of the jury's verdict." *United States v. Dickey*, 736 F.2d 571, 581 (10th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985).

Beginning sometime in December 1979, Outlaws from Florida made frequent trips to Oklahoma to deliver drugs. During January and February of 1980, the Oklahoma City chapter had frequent chapter meetings to discuss prices for and means of distributing these drugs. In addition, members would occasionally discuss additional sources for drugs. These meetings form the basis for the alleged Oklahoma drug conspiracy. Messrs. Killip, Adams, Marr, and Nelson were present at these meetings, but Mr. Teague was only a probate at the time, and as such he was not permitted to attend chapter meetings. Thus, Mr. Teague did not participate in the Oklahoma drug conspiracy.

Mr. Teague was, however, involved in the Belleville drug transactions. Undercover agents had arranged to purchase a one-thousand-tablet lot of LSD from Sheila Darlene Nichols. On November 26, 1980, they were in her house in Belleville, Illinois, when Mr. Killip and Mr. Teague arrived on the scene. Mr. Teague was carrying a brown paper bag, and Ms. Nichols took the two defendants into a bedroom, where the contents of the paper bag were poured on the bed. The agents saw the tablets and identified them as the same tablets that were later sold as, and confirmed to be, LSD. Mr. Killip also made subsequent deliveries of LSD to Ms. Nichols on December 5, 1980, and March 28, 1981.

On July 29, 1981, Mr. Pfaff and another man were arrested for driving under the

influence of alcohol. After taking the two men to the police station in a scout car, the arresting officer searched the car and found a small bottle underneath the rear seat containing, chemical analysis later revealed, LSD. Mr. Pfaff subsequently was convicted in state court for possession of LSD.

The Florida drug transactions began in March 1982 when, as former Outlaw, William Edward Gorman, testified, he, Mr. Killip and Mr. Krout traveled to various cities in Florida. While in Tampa, the three men visited the home of the Tampa chapter president, Tony Harrell Wilson, where they "snorted" cocaine. Mr. Killip, Mr. Krout, and Mr. Gorman were all present when Mr. Harrell was arrested on March 9, 1982. After leaving Florida, Mr. Gorman and Mr. Killip engaged in further drug activities in Atlanta.

On April 11, 1982, the Oklahoma City chapter had a party outside Ardmore, Oklahoma. Maria Elizabeth Higgins and her escort were admitted to the party as invited guests. They were enjoying the party until Ms. Higgins mentioned the name of a well-known government informant. The atmosphere immediately became very tense, and Mr. Killip ordered that Ms. Higgins and her escort would not be permitted to leave the party. When Ms. Higgins attempted to sneak away, Mr. Killip beat her severely and ordered Mr. Gorman to confine her to a tent. Guards were posted outside the tent, and numerous Outlaws participated in a gang-rape of Ms. Higgins. While the testimony is unclear as to who participated in the kidnapping and rape, Messrs. Killip, Adams, Krout, Nelson and Pfaff were clearly present. Furthermore, as members of the club, Messrs. Adams, Krout, Nelson and Pfaff were required to enforce Mr. Killip's order forbidding Ms. Higgins and her escort from leaving the party. Based upon the circumstances, the jury apparently inferred that these men either committed or agreed to commit the kidnapping.

Seven months later, on October 27, 1982, Mr. Killip and Mr. Krout, who were carrying $2199 in cash, were arrested in Fort Smith, Arkansas. The cash was payment for cocaine that an Outlaw named Mendotta had fronted to Mr. Killip at a regional run in Oklahoma. Even though the charges in connection with this incident were dismissed, the jury could conclude that Mr. Killip and Mr. Krout had transported money in interstate commerce to repay a debt created by a drug transaction.

The final predicate offense was the attempted arson on the Oklahoma City club house. The owner of the house rented it to Mr. Adams, apparently believing it would be used as a family residence. When she checked on the house, she discovered it had been converted into an Outlaws' club house. The windows were boarded up, with only slits left as peepholes; a bar had been set up in the dining room; a motorcycle ramp rested on the front porch where motorcycles were parked; and mattresses covered the floors. The owner expressed her disapproval and threatened to evict Mr. Adams. Mr. Adams displayed his Outlaws tattoos and proclaimed that he was an Outlaw and that the owner had no right to talk to him in that manner. He then threatened to burn the house down and claimed that he had connections at the courthouse that would "take care of everything."

On March 10, 1983, after the Outlaws had abandoned the house, the owner returned with a police officer. All the doors were locked, and the owner did not have the key to the locks. When they found an open window, the owner and the police officer smelled gas coming from the kitchen. Upon examination, they saw that the gas knobs on the stove had been removed and a continuous stream of gas was flowing from the connection. The police officer, who felt the condition of the house was extremely dangerous, immediately called the fire department and cleared the area of all residents. The jury apparently concluded that the Outlaws had attempted to destroy the house.

Before trial, the Government used the above information to obtain a grand jury indictment. After the indictment was returned, the Government sought a search warrant allowing it to search the Oklahoma City chapter club house for indication of

membership in the Outlaws Motorcycle Club. The affidavit in support of the warrant was signed by an FBI agent who had been involved in the investigation of illegal activities by the club. The affidavit identified the defendants, explained that they kept various indicia of club membership at the club house, and set forth in great detail many of the facts underlying the indictment. The court issued a search warrant, which was executed on February 12, 1985. During execution of the warrant, officers seized—and the Government subsequently presented in evidence—guns, wearing apparel, flags, a police scanner and assorted papers, including club mottos, mailing lists, house rules and Christmas cards. The validity of the search warrant, called an indicia warrant because it sought indicia of membership, was challenged in the trial court; but the court overruled defendants' objections.

## II. *Issues on Appeal*

The defendants raise four issues on appeal. First, Mr. Marr claims that even though he did not move for a separate trial, the trial court should have ordered a separate trial. Second, Mr. Krout and Mr. Teague argue that their convictions cannot stand because the Government has not presented any evidence showing that they committed or agreed to commit at least two predicate acts. Third, Messrs. Killip, Adams, Krout and Nelson contend that the Government has not shown any connection between the illegal acts by individual defendants and the alleged RICO enterprise, the Outlaws Motorcycle Club. Finally, Messrs. Killip, Adams, Krout, Marr and Nelson claim that the indicia warrant was invalid and the evidence obtained pursuant to the warrant should have been suppressed by the trial court.

### A. *Severance*

■ Mr. Marr did not ask for severance in the trial court; rather, he contends that a joint trial was so prejudicial that the trial court was required to sever his trial. Joinder is clearly proper under Fed.R.Crim.P. 8(b), because the Government alleged that Mr. Marr had "participated in the same ... series of acts or transactions" as the other defendants. Thus, Mr. Marr can only obtain a separate trial under Fed.R.Crim.P. 14, and the Government argues that he has waived that right.

Since Mr. Marr did not seek severance in the trial court, he has waived the issue unless he can show that actual prejudice resulted from the joint trial. *United States v. Butler*, 792 F.2d 1528, 1534 (11th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986); *United States v. Sweeney*, 688 F.2d 1131, 1140 (7th Cir. 1982); *see also United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir.1984) (defendant "waived any right he might have had to a severance under Fed.R.Crim.P. 14 by failing to request it before trial"); *United States v. Cyr*, 712 F.2d 729, 735 n. 4 (1st Cir.1983) ("A motion for severance must be made prior to trial ... or it is waived ..."); Fed.R.Crim.P. 12(b)(5) (motion to sever must be raised prior to trial). Mr. Marr has not shown actual prejudice and, thus, is not entitled to a separate trial.

### B. *Substantial Evidence of Predicate Acts*

Mr. Krout and Mr. Teague were acquitted of any substantive RICO violations, but were convicted on the RICO conspiracy charges. They now contend that the Government did not produce evidence of their commission of, or agreement to commit, at least two predicate acts, as is required for a RICO conspiracy conviction. While admitting that the circuits are split on the issue of whether the defendant must agree to personally commit two predicate acts or merely agree to the commission of two predicate offenses by any conspirator, *compare United States v. Ruggiero*, 726 F.2d 913, 921 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984) and *United States v. Winter*, 663 F.2d 1120, 1136 (1st Cir.1981), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983), *with United States v. Neapolitan*, 791 F.2d 489, 498 (7th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 421, 93 L.Ed.2d 371, *cert. denied*, — U.S. —, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986); *Unit-*

# 1548

*ed States v. Joseph,* 781 F.2d 549, 554 (6th Cir.1986); *United States v. DiDonato,* 759 F.2d 1099, 1116 (3d Cir.), *cert. denied,* ——— U.S. ———, 106 S.Ct. 275, 88 L.Ed.2d 236 *cert. denied,* ——— U.S. ———, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985); *United States v. Tille,* 729 F.2d 615, 619 (9th Cir.), *cert. denied,* 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93, *cert. denied,* 469 U.S. 848, 105 S.Ct. 164, 83 L.Ed.2d 100 (1984), and *United States v. Carter,* 721 F.2d 1514, 1531 (11th Cir.), *cert. denied,* 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984), the Government argues that it need only show that the defendants have agreed to the commission of at least two acts by any conspirator. This court has not decided the issue, but because of the trial court's instructions in this case, we do not reach it here.

■ The court instructed the jury that to establish a RICO conspiracy the Government was required to show three elements: (1) a conspiracy was formed to participate in RICO activities; (2) the defendant agreed to join the conspiracy; and (3) one or more of the conspirators committed at least one overt act. The specific instructions on the second element read:

> [The Government must prove that] a defendant, by his words or actions, objectively manifested an *agreement to willfully participate,* directly or indirectly, in the affairs of the enterprise *through the commission of two or more offenses* which make up the pattern of racketeering activity in this case, that is, kidnapping, attempted arson, travel in interstate commerce related to controlled substances in violation of federal laws, possession of controlled substances with intent to distribute in violation of federal law, and conspiracy to distribute controlled substances in violation of federal laws.

Record, vol. 2, at 467–68 (emphasis added). The court further clarified:

> With regard to the second element, you may find that the defendant agreed to participate in the affairs of the enterprise through a pattern of racketeering activity if you find that he *agreed personally to commit two or more racke-*

*teering acts* to further the affairs of the enterprise. You need only find that he agreed to commit these acts; you need not find that he actually committed them.

*Id.* at 468 (emphasis added).

Thus, the law of this case is that a defendant cannot be convicted of the RICO conspiracy charge unless he "agreed personally to commit two or more racketeering acts." Consequently, we must review Mr. Krout's and Mr. Teague's cases to determine whether the Government has shown that each personally committed or agreed to commit two or more predicate acts.

### 1. *Mr. Teague*

■ Mr. Teague was named in only two predicate acts: (1) the Oklahoma drug conspiracy, and (2) the Belleville drug transactions. He admits that the Government produced substantial evidence to show his involvement in the Belleville drug transactions, but claims it has not shown that he personally agreed to participate in the Oklahoma drug conspiracy. The Government's evidence shows that the Oklahoma City chapter held meetings during January and February of 1980, and that in those meetings members of the chapter discussed distribution of drugs. However, the witnesses who testified about those meetings also testified that Mr. Teague was only a hangaround at the time, and that hangarounds are not allowed to attend any club meetings. Thus, Mr. Teague could not have joined the conspiracy through his attendance at the meetings. Furthermore, the Government produced no other evidence of Mr. Teague's participation in the Oklahoma drug conspiracy. Thus, the Government did not supply any evidence showing that Mr. Teague participated in the Oklahoma drug conspiracy. Under the law of this case, the Government has not presented substantial evidence to support Mr. Teague's RICO conspiracy conviction and it must be reversed.

### 2. *Mr. Krout*

■ The indictment named Mr. Krout in three predicate acts: (1) the Florida drug transactions; (2) the Ardmore kidnapping;

and (3) the Fort Smith incident. Mr. Krout does not challenge the evidence on the Florida drug transactions, but claims that the evidence on the other two events is insufficient. Because the evidence is sufficient to support the Fort Smith incident as a predicate act, we need not reach the Ardmore kidnapping.

Mr. Krout argues that, since the charges were dismissed, his participation in the Fort Smith incident cannot be used to support his RICO conspiracy conviction. However, his conviction does not turn on whether the charges filed in 1982 were dismissed, but on whether the Government has provided substantial evidence showing that Mr. Krout did engage in interstate transportation of drug money. The evidence is more than sufficient to support such a finding. It indicates that Mr. Killip and Mr. Krout were traveling from Oklahoma to Tennessee, via Arkansas, and that they delivered drug money to Mendotta. Thus, the Government has presented sufficient evidence to support Mr. Krout's conviction on the RICO conspiracy charge.

## C. *Nexus Between Illegal Acts and the RICO Enterprise*

■ Messrs. Killip, Adams, Krout and Nelson admit that the Government has shown illegal acts by individuals and that those individuals are or were members of the Outlaws Motorcycle Club, but they claim that the Government has not shown any connection between the illegal acts and the alleged RICO enterprise, the Oklahoma City chapter of the Outlaws Motorcycle Club. Essentially, the claim is that the evidence is not sufficient to show a connection between the illegal acts and the club. As with all sufficiency of the evidence questions, we must review the evidence in a manner most favorable to the Government's position. *Dickey*, 736 F.2d at 581.

In order to uphold the finding of a nexus between the illegal acts and the alleged RICO enterprise, the Outlaws Motorcycle Club, we need only find a relation between the predicate offenses and the affairs of the enterprise. *Carter*, 721 F.2d at 1527. In *Carter*, a dairy farm was used to facilitate distribution of drugs. The defendants used land on the dairy both as an airstrip and as a stash house for drugs. Farm employees assisted in the drug smuggling. No evidence showed that the farm actually benefited from the drug smuggling activities; rather, the court concluded that use of the farm facilities in the drug smuggling was sufficient to provide a nexus between the illegal acts and the farm. *Id.*

Similarly, the club facilitated the defendants' drug activities. Defendants do not argue that the club did not assist in the drug distribution; rather, they argue that the club did not benefit from the drug distribution. This misinterprets the nexus requirement. The Government need only show that the club facilitated the illegal activities. The club furnished connections in Florida who provided drugs to Oklahoma City club members who wished to profit from selling drugs. Furthermore, Mr. Killip, as president of the chapter, decided who was and who was not allowed to sell drugs in Oklahoma City. Finally, at some of the chapter meetings, the price of drugs was discussed. The Outlaws Motorcycle Club played an important role in the predicate acts involving drug transactions.

In fact, the jury could have inferred that some of the predicate acts actually benefited the club. Although we need not decide whether Mr. Krout participated or agreed to participate in the kidnapping, we have no doubt that the requisite nexus existed between that predicate act and the illegal enterprise. The Government argues that the kidnapping was a sign to everyone of what would happen to those who attempted to hinder the activities of the club. Ms. Higgins was kidnapped and beaten only after she mentioned a well-known government informant. Thus, concludes the Government, the activities were a sign of the consequences of becoming a government "snitch." In addition, many government witnesses testified that they would not disclose where they were living, because they were afraid the Outlaws would seek their lives. When that evidence is combined with the Outlaws motto: "God forgives, Outlaws don't," the jury is justified in reaching the conclusion that the

kidnapping was meant to protect the illegal activities of the club. Altogether, the evidence indicates that anyone who impeded the Outlaws' activities would have to pay.

The Government also argues that the attempted arson benefited the club. The threats made by Mr. Adams intimidated the owner of the house and could have resulted in her allowing the Outlaws to stay in the house. When this did not work, the Outlaws apparently planned to destroy the house. Essentially, this attitude of "if we can't have it, no one can" showed that the members of the club were willing to go to great lengths to maintain their organization—even to illegal acts such as arson.

Given the evidence in this case, we conclude the jury could reasonably find a nexus between the illegal acts and the club.

### D. *Validity of Indicia Search Warrant*

Finally, Messrs. Killip, Adams, Krout, Marr and Nelson claim that the search warrant allowing the Government to search for indicia of membership in the Outlaws Motorcycle Club was invalid. Their argument is based on *United States v. Rubio*, 727 F.2d 786 (9th Cir.1983). In that case a federal magistrate had issued an indicia warrant authorizing the search for, and seizure of, "indicia of membership in or association with the Hell's Angels." The affidavits in support of those warrants stated the types of indicia customarily kept by members and associates of the Hell's Angels Motorcycle Club, indicated specific facts showing each individual's membership or association with the club and informed the magistrate that a grand jury indictment charging the defendants with RICO violations had been returned. *Id.* at 794.

In reviewing the affidavit, the Ninth Circuit stated:

> [V]irtually all of the items described in the search warrants were "mere evidence." Therefore, in addition to examining the warrants for probable cause to believe the evidence sought would be found in the places described in the warrants, *see United States v. Flores*, 679 F.2d 173, 175 (9th Cir.1982), we must also examine the warrants for probable cause to believe there was a connection between the evidence sought and a violation of the RICO statute.

*Rubio*, 727 F.2d at 793. The court then found that the magistrate had no basis for finding probable cause to believe that the evidence sought would show a violation of the RICO statute. The only basis for finding such probable cause was that an indictment had been returned by a grand jury. The court concluded that it was the magistrate's obligation to determine whether the facts showed probable cause of RICO violations, and that the grand jury indictment alone was not sufficient to show probable cause. Thus, the warrant was invalid. *Id.* at 794–95.

■ The affidavit in the present case is different from the one in *Rubio*. The affidavit here does not simply state that an indictment has been returned; rather, it lists facts from the indictment that tend to support the conclusion that the Outlaws Motorcycle Club is a RICO enterprise and that association with that enterprise may be illegal. The facts given provide a magistrate with probable cause to believe such connection exists. As a result, the missing element in *Rubio*, probable cause to believe that the evidence sought is connected with a violation of the RICO statute, is present in this case. The indicia warrant is valid, and thus, the evidence obtained pursuant to that warrant is admissible.

### III. *Conclusion*

Our review of this case shows that Mr. Teague's conviction should be reversed, and the other convictions should be affirmed. Mr. Marr waived his right to a separate trial and has not shown any actual prejudice resulting from the joint trial. The Government presented sufficient evidence to show that Mr. Krout committed or agreed to commit at least two predicate acts and to show a nexus between the illegal acts and the Outlaws Motorcycle Club. Finally, the magistrate who issued the indicia search warrant had probable cause to issue the warrant. Only Mr. Teague, who has shown that the Govern-

ment did not show his participation in two predicate acts, provides grounds for reversal of his conviction. Accordingly, Mr. Teague's conviction is REVERSED, and the other defendants' convictions are AFFIRMED.