**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 10, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

RICHARD WYATT,

      Defendant - Appellant.

No. 18-1135

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:16-CR-00057-MSK-1)**
_____

Submitted on the briefs:*

William D. Lunn, Tulsa, Oklahoma, for Defendant-Appellant.

James C. Murphy, Assistant United States Attorney and Jason R. Dunn, United States Attorney, Denver, Colorado, for Plaintiff-Appellee.
_____

Before **PHILLIPS**, **EBEL**, and **O'BRIEN**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

---

* After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

In this direct criminal appeal, Defendant Richard Wyatt challenges his two convictions for conspiring with others to deal in firearms without a federal firearms license. The Government concedes that the district court erred in failing to instruct the jury that, in order to convict Wyatt of these conspiracy offenses, the jury had to find that Wyatt and his alleged co-conspirators acted willfully; that is, that they knew they were agreeing to do something unlawful. The Government further concedes that this error warrants vacating Wyatt's conspiracy convictions and remanding for a new trial. But Wyatt contends that there was insufficient evidence presented at trial for a reasonable jury to find that he and his co-conspirators acted willfully and, therefore, this court should, instead, dismiss the conspiracy counts charged against him with prejudice. We disagree with Wyatt and conclude there was sufficient evidence presented at trial that, if believed, would have supported a reasonable jury finding beyond a reasonable doubt that Wyatt and his co-conspirators knew they were agreeing to violate the law. Therefore, having jurisdiction under 28 U.S.C. § 1291, we VACATE Wyatt's two conspiracy convictions and REMAND this case to the district court for further proceedings.

## I. BACKGROUND

A grand jury indicted Wyatt on thirteen counts stemming primarily from the operation of his gun store, Gunsmoke. Those thirteen charges generally fell into one of two categories: 1) failing to file individual or corporate tax returns or filing a false return, and 2) dealing in firearms without a federal firearms license ("FFL"). The jury convicted Wyatt on all of the tax counts, and he does not challenge those

2

convictions on appeal. It is, instead, the second category, the unlicensed gun-dealing charges, that is at issue here. Those charges included three substantive counts of willfully dealing in firearms without an FFL, in violation of 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D) (Counts 2, 3, and 4),[1] and the two counts at issue in this appeal, charging Wyatt under 18 U.S.C. § 371 with conspiring with others to deal in firearms without an FFL (Counts 1 and 5).[2] Wyatt's defense at trial to these unlicensed gun-dealing charges was that he did not know that what he was doing— using acquaintances' FFLs to continue to deal in firearms through Gunsmoke after Gunsmoke surrendered its own FFL—was unlawful. At the conclusion of the trial, the district court instructed the jury that, as to the three substantive counts, the Government had to prove beyond a reasonable doubt that Wyatt acted "willfully"; that is, that he knew his conduct was unlawful, even if he did not know the exact law

---

[1] Section 922(a)(1)(A) provides that "[i]t shall be unlawful . . . for any person . . . except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce." Section 924(a)(1)(D) further provides, in relevant part, that "whoever . . . willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both." Section 922(a)(1)(A) is one of the "other" provisions to which this willfulness requirement applies. See Bryan v. United States, 524 U.S. 184, 188 (1998).

[2] Section 371 provides, in relevant part:

> If two or more persons conspire . . . to commit any offense against the United
> States, . . . or any agency thereof in any manner or for any purpose, and one
> or more of such persons do any act to effect the object of the conspiracy, each
> shall be fined under this title or imprisoned not more than five years, or both.

it violated.[3]  See Bryan v. United States, 524 U.S. 184, 187-88, 191-96 (1998) (addressing what the Government must prove to establish that the defendant willfully violated 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D)).  After deliberating for six days, the jury deadlocked on those three substantive charges, the district court declared a mistrial on those counts and later granted the Government's motion to dismiss those counts without prejudice.

As for the two counts charging Wyatt with conspiring to deal in firearms without a license, the district court instructed jurors, among other things, that the Government had to prove beyond a reasonable doubt, as to each charged conspiracy,

---

[3] On the three substantive counts, the district court specifically instructed the jury:

> Instruction No. 24. To prove Counts 2 through 4, dealing in firearms without a license, the Government must prove each of the following elements beyond a reasonable doubt with regard to each count.
>
> One, that Mr. Wyatt was a dealer in firearms on the date charged; two, that as of the date charged, Mr. Wyatt did not have a license issued under federal law to deal in firearms; and, three, that Mr. Wyatt acted willfully -- that is, with knowledge that his conduct was illegal.
>
> . . . .
>
> Instruction No. 26. In determining whether Mr. Wyatt acted willfully, you are instructed that a person acts willfully when he knows that his conduct is unlawful. A person may act willfully to violate the law even if he is not aware of the specific law or rule that his conduct violates. The Government must prove beyond a reasonable doubt that Mr. Wyatt acted willfully to violate the law. Mr. Wyatt contends that he mistakenly believed that he could use the federal firearms license of another firearms dealer to sell firearms and engage in gunsmithing; and, therefore, he did not act willfully in violating the law.

III R. 1334-35.

4

that "Wyatt entered into an agreement with at least one other person," the objective of that agreement was for "Wyatt to act as a dealer in firearms without having a license to do so," "Wyatt knew the goal of the agreement" and "knowingly and voluntarily participated in the agreement," either Wyatt or another person who had entered into the agreement committed an overt act in furtherance of the agreement, and "there was interdependence among the persons entering into the agreement such that they intended to carry out the objective for their own mutual, shared benefit." (III R. 1330-31.) But the district court did not instruct the jury that the Government had to prove that Wyatt's conduct was willful; that is, that he and his co-conspirators knew that what they had agreed to do was unlawful. The jury convicted Wyatt of those two conspiracy counts.

The Government now concedes that the district court erred in failing to instruct jurors that, in order to convict Wyatt of the conspiracy counts, they had to find beyond a reasonable doubt that Wyatt and his co-conspirators had acted willfully. The Government acknowledges that, "in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute [under 18 U.S.C. § 371], the Government must prove at least the degree of criminal intent necessary for the substantive offense itself," United States v. Feola, 420 U.S. 671, 686 (1975); see also United States v. Weeks, 653 F.3d 1188, 1202 (10th Cir. 2011).[4] Though this court is

---

[4] The parties disagree as to whether Wyatt raised and preserved this argument at trial by requesting an instruction on his theory of defense. But the Government concedes that, even under plain error review, see Fed. R. Crim. P. 52(b), the two conspiracy convictions must be vacated.

5

not required to accept the Government's concession, see United States v. Dowell, 430

F.3d 1100, 1110 (10th Cir. 2005), we do so in this case because we agree with the

parties that the district court erred in instructing the jury on the two conspiracy

counts.  We, therefore, VACATE both of Wyatt's conspiracy convictions.

The parties disagree on what should happen next.  The Government asks the

Court to remand this case for further proceedings on the two conspiracy charges,

which may include a new trial.  Wyatt contends instead that, because there was

insufficient evidence presented at trial from which a reasonable jury could have

found beyond a reasonable doubt that Wyatt and his co-conspirators agreed to do

something they knew was illegal, we should order the district court to dismiss those

charges with prejudice.  See United States v. Burks, 437 U.S. 1, 18 (1978) (holding

"that the Double Jeopardy Clause precludes a second trial once the reviewing court has

found the evidence legally insufficient").  See generally United States v. Wheeler, 776

F.3d 736, 741 (10th Cir. 2015) (considering sufficiency of evidence to support

finding subjective intent, on which trial court erroneously failed to instruct jury).

## II. STANDARD OF REVIEW

Here, then, we must decide whether there was sufficient evidence presented at

trial for a reasonable jury, properly instructed, to have found beyond a reasonable

doubt that Wyatt and his co-conspirators knew what they agreed to do was unlawful.[5]

---

[5] We, therefore, consider here only whether there was sufficient evidence for a
reasonable jury to find willfulness and do not consider whether there was sufficient

6

See Musacchio v. United States, 136 S. Ct. 709, 715 (2016) (holding that, where trial court's unobjected-to instructions erroneously required jury to find an additional element in order to convict the defendant, the legal question of the sufficiency of the evidence to support the conviction is assessed on appeal using the correct elements of offense, rather than the heightened instruction the trial court erroneously gave the jury)[6]; United States v. DeChristopher, 695 F.3d 1082, 1091 n.4 (10th Cir. 2012) (noting that Tenth Circuit has indicated, in dicta, that even where the instructional error did not improperly add an element, sufficiency of the evidence is assessed by considering whether a properly instructed jury could have convicted the defendant).

> Further, we would ordinarily
>
> review the sufficiency of the evidence to support a conviction or the denial of a defendant's motion for judgment of acquittal de novo. We take the evidence—both direct and circumstantial, and reasonable inferences drawn from that evidence—in the light most favorable to the government and ask only whether a reasonable jury could find the defendant guilty beyond a reasonable doubt. We may not weigh evidence or consider credibility of witnesses. The evidence, together with the reasonable inferences to be drawn therefrom, must be substantial, but it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt.

---

evidence presented on any other element of the charged conspiracies. See United States v. Burkholder, 816 F.3d 607, 620 n.11 (10th Cir. 2016).

[6] Musacchio expressly abrogated our earlier decision in United States v. Romero, 136 F.3d 1268, 1272-73 (10th Cir. 1998), in which we measured the sufficiency of the evidence using the erroneous heightened instruction given the jury, under a law-of-the-case theory. See 136 S. Ct. at 714-15. Similarly, Musacchio has the effect of abrogating previous Tenth Circuit authority which had adopted the same rule which Musacchio abrogated in Romero. See United States v. Cronic, 900 F.2d 1511, 1515 n.3 (10th Cir. 1990); United States v. Killip, 819 F.2d 1542, 1548 (10th Cir. 1987); United States v. Woodring, 464 F.2d 1248, 1251 (10th Cir. 1972).

United States v. Rufai, 732 F.3d 1175, 1188 (10th Cir. 2013) (citations, internal quotation

marks, alterations omitted).

In this case, however, because Wyatt did not raise his current challenge to the

sufficiency of the evidence in his Fed. R. Crim. P. 29 motion for acquittal, our review

is not de novo, but instead is for plain error. See Fed. R. Crim. P. 52(b); see also

Rufai, 732 F.3d at 1189.

> To establish plain error, the appellant must demonstrate the district court (1) committed error, (2) the error was plain, and (3) the plain error affected her substantial rights. If these factors are met, we may exercise discretion to correct the error if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings.

Id. (quotation, alteration omitted).

> A conviction in the absence of sufficient evidence of guilt, however, almost always meets the first three factors of plain error review. Moreover, it is only in a rare case when the absence of sufficient evidence will not meet the fourth factor of plain error review. Thus, review under the plain error standard in this case and a review of sufficiency of the evidence usually amount to largely the same exercise.

Id. (citations, internal quotation marks, alterations omitted).

### III. DISCUSSION

We consider, then, the evidence presented at trial, viewing it in the light most

favorable to the Government and drawing all reasonable inferences from that

evidence in the Government's favor. See Rufai, 732 F.3d at 1188. Doing so, we

conclude that there was sufficient evidence presented at trial from which a reasonable

jury could find beyond a reasonable doubt that Wyatt and his co-conspirators, in each

of the two charged conspiracies, knew that what they agreed to do was unlawful. In

8

each charged conspiracy, the object agreed to was to assist Wyatt in continuing to deal in firearms through Gunsmoke, after Gunsmoke surrendered its own FFL, by facilitating Gunsmoke's use of others' FFLs. Wyatt points out that both he and his confederates testified that they did not think what they were doing was illegal; at trial, Wyatt offered explanations for his actions based on his understanding of the firearm regulations; and his confederates testified that they received guidance from the federal Bureau of Alcohol, Tobacco and Firearms ("ATF") that indicated that what they were doing was not against the law. Based on that evidence, a reasonable jury could acquit Wyatt of the conspiracy charges.

But a reasonable jury would not be required to deem any of that testimony credible and, as we explain, there was also sufficient evidence presented at trial that Wyatt and his co-conspirators instead tried to cover up what they were doing. In light of that evidence, a reasonable jury, properly instructed, could find that Wyatt and his co-conspirators knew that what they agreed to do was unlawful. See United States v. Porter, 928 F.3d 947, 957 (10th Cir. 2019) (stating, in assessing sufficiency of the evidence on the question of whether the defendant acted with the required racial animus, that "even when a defendant, as here, denies having the requisite intent, a jury may disbelieve the defendant if his words and acts in the light of all the circumstances make his explanation seem improbable" (internal quotation marks, alterations omitted)); see also United States v. Villa, 589 F.3d 1334, 1341–42 (10th Cir. 2009) (noting, in assessing sufficiency of the evidence, that, although there was testimony that would support finding that the defendant did not intend to use the gun in furtherance of a drug-

trafficking offense, "the jury was free to disbelieve this testimony"); cf. United States v.
Delreal-Ordones, 213 F.3d 1263, 1268 (10th Cir. 2000) (stating, in considering whether
there was sufficient evidence to warrant the trial court giving the Government's requested
deliberate-ignorance instruction, that "[w]hile the jury was free to find that Defendant
had no knowledge of the drugs in his suitcase, the jury had sufficient evidence before it to
disbelieve Defendant and make a contrary finding — that Defendant 'deliberately
blinded' himself to the existence of the fact").

## A. Background

There was evidence presented at trial that an FFL is required for dealing in
firearms, which includes engaging in the business of buying and selling firearms, and
gunsmithing. An FFL can be issued either to a business or an individual. In either
event, an FFL is issued only for one specific location, and the license must be
displayed at that location.

When an FFL is issued to a business, the FFL lists the "responsible" person or
persons for that license. A licensee or its responsible party must keep an acquisition
and disposition ("A&D") book into which the licensee must log every firearm that
comes into the licensee's possession and log out any firearm that the licensee
transfers out of its possession. This A&D log requirement applies to any firearms
left with a gunsmith for repairs or other work, except when the gunsmithing is short-
term and does not require the firearm to be left overnight with the gunsmith. An FFL
is still required in order for the gunsmith to do such short-term projects, but a firearm
that is not left overnight need not be logged into and out of the FFL's A&D book.

10

Before issuing an FFL, the ATF conducts an inspection and interview with the license applicant. As part of that initial inspection and interview, an ATF agent provides the licensee with a book of laws and regulations that apply to the applicant and verbally goes over the main laws and regulations that are relevant to an FFL. Both the agent and FFL applicant then sign a form acknowledging those laws and regulations. Those regulations include, for example, the requirement that, if there is any change in ownership in a licensed business, a new license is required. Furthermore, an FFL is not transferable; the FFL itself states this in red lettering.

Once approved, an FFL must be renewed every three years. In addition, the licensee is subject to periodic compliance inspections. During such an inspection, the inspecting ATF agent again reviews with the licensee the main laws and regulations governing the FFL, as well as discussing with the licensee any problems uncovered by the inspection.

Wyatt studied gunsmithing after high school and then, in the 1980s, obtained an FFL and opened his own firearms business. That FFL expired in the late 1980s. Wyatt obtained another FFL in the 1990s for his business, Gunsmoke Gunsmithing. At some point, Wyatt relocated his business to West 44th Avenue in Wheatridge, Colorado. Gunsmoke Gunsmithing's FFL ended in 2006. That same year, Wyatt and Victor Rodriguez started Gunsmoke Inc. at the same Wheatridge location. Both Rodriguez and Wyatt explained at trial that, although Wyatt financed and ran the store, Rodriguez, not Wyatt, was listed as Gunsmoke's registered agent and its president because Wyatt was in the midst "of a bad divorce" and "he couldn't be"

11

listed on any of the corporate paperwork.  (III R. 457.)  It was also Rodriguez who obtained an FFL for Gunsmoke, Inc., listing himself as the "responsible" party.  After speaking to both Rodriguez and Wyatt, however, the ATF agent conducting Gunsmoke's initial inspection/interview determined that Wyatt, too, should be listed as a "responsible" party on Gunsmoke's FFL.  During that initial interview/inspection, the ATF agent verbally explained the relevant FFL regulations and requirements to both Wyatt and Rodriguez, and they both signed the form acknowledging those regulations and requirements.

Rodriguez only worked at Gunsmoke for six to eight months.  After that, Wyatt ran the business on his own.  After an inspection in 2008 uncovered violations, an ATF agent again met with Wyatt and reviewed the FFL regulations and requirements.  The same type of regulation review between the ATF and Wyatt occurred after a month-long inspection in 2010.  After that inspection uncovered fifteen violations, the ATF, in 2011, notified Gunsmoke that it intended to revoke Gunsmoke's FFL.  To avoid that, Rodriguez (in whose name the FFL remained) agreed instead to surrender Gunsmoke's FFL.  The "surrender agreement" Rodriguez entered into with the ATF, dated January 19, 2012, gave Gunsmoke three months, until April 24, 2012, to wind down its business, after which Gunsmoke agreed to discontinue its business, including ceasing to order, purchase or sell firearms, or conduct gunsmithing.

## B.  Count 5 – Conspiring from February 17, 2012 to April 24, 2013

12

With this context in mind, we turn first to Count 5, which charged Wyatt with conspiring, between February 17, 2012 to April 24, 2013, with Dennis and Brian Meidel, among others, to deal in firearms at Gunsmoke without an FFL. The evidence presented at trial, viewed in the light most favorable to the Government, established the following:

Faced with the surrender of Gunsmoke's FFL, Wyatt, who was running Gunsmoke, did not use the three months provided by the surrender agreement to wind down the store's business. Instead, he entered into an arrangement to continue operating Gunsmoke using another FFL. The family of one of Wyatt's gunsmiths, Brian Meidel, had an FFL which was issued to the Meidels' business, Triggers Firearms, which the family operated out of their home. The responsible parties listed for Triggers' FFL were Dennis Meidel, his daughter, and his son Brian (the gunsmith). Dennis Meidel offered Triggers' FFL to help Wyatt and Gunsmoke stay in business so that his son Brian would continue to have his gunsmithing job. Both Dennis Meidel and Wyatt testified that they did not think what they were doing violated the law. But there was evidence to the contrary.

Dennis Meidel expressly testified that he "transferr[ed]" Triggers' FFL to Wyatt (III R. 362), notwithstanding the red lettering on the license stating that it was not transferable. To facilitate this "transfer," Dennis Meidel notified the ATF that Triggers was relocating from the Meidel home to Gunsmoke's Wheatridge location. When he submitted Triggers' change-of-address information to the ATF, Dennis Meidel also included a fake lease that Wyatt had provided him. The lease stated that

13

Meidel, as the tenant, would pay rent for the Gunsmoke location to the landlord, Trifecta Capital (a company Wyatt created in Victor Rodriguez's name). Although Meidel signed the lease and sent it to the ATF as evidence of Trigger's change of location, no one ever enforced or abided by the terms of that lease. If Wyatt and Dennis Meidel thought their arrangement letting Wyatt use Triggers' FFL to continue operating Gunsmoke was lawful, why the need to submit a fake lease to the ATF?

Thereafter, Dennis Meidel recorded Gunsmoke's inventory into Triggers' A&D log and then recorded any subsequent Gunsmoke firearm acquisition or transfer, but Wyatt continued to run all other aspects of Gunsmoke's business. Several months after submitting the falsified lease to the ATF, Meidel applied to renew Triggers' FFL. In doing so, he changed the name of the licensed entity from Triggers to Triggers doing business as Gunsmoke. But Dennis Meidel still listed Triggers' responsible parties as himself, his daughter, and his son Brian. The renewal application did not list Wyatt as a responsible person, even though Wyatt continued to make all business decisions at Gunsmoke. This was contrary to what ATF agents, during regulatory reviews with the Meidels and with Wyatt, informed them—that any change of control of a licensed entity required a new FFL. Thus, based on this evidence, a reasonable jury could find that Dennis Meidel knowingly hid from the ATF Wyatt's continued operation of Gunsmoke.

In light of the false lease submitted to the ATF and the actions Dennis Meidel took to hide from the ATF that it was Wyatt who was continuing to operate Gunsmoke, a reasonable jury could find beyond a reasonable doubt that Wyatt and

14

Dennis Meidel knew that it was unlawful for Wyatt to use Triggers' FFL to deal in firearms through Gunsmoke.

The ATF declined to renew Triggers' FFL. The Meidels then entered into a written agreement with the ATF through which they agreed to surrender their FFL in lieu of having it revoked. That agreement, dated January 6, 2013, gave the Meidels until April 2013, to wind down Triggers' business at Gunsmoke. In that surrender agreement, the Meidels specifically agreed "not to engage in any firearms operations through a surrogate firearms licensee." (III R. 377.)

## C. Count 1 – Conspiring between April 1, 2013 and March 31, 2015

Next, Count 1 charged Wyatt with conspiring, between April 1, 2013, and March 31, 2015, with unnamed co-conspirators to deal in firearms at Gunsmoke without a license. Regarding this charge, the trial evidence, viewed in the light most favorable to the Government, established the following:

Wyatt, who alone was running Gunsmoke using the Triggers' FFL, did not use the three-month period provided in the Meidels' surrender agreement to wind up Gunsmoke's business. Instead, Wyatt continued to operate his gun shop for the next two years, until the ATF and IRS raided the store in March 2015. During those two years, signs at the gun shop continued to invite customers to come in to "buy, sell, trade" firearms (III R. 593, 1033, 1219), and to advertise Gunsmoke's gunsmithing services. Customers continued to come into the store and purchase or trade guns. Two undercover ATF agents were able to walk into Gunsmoke and purchase several firearms on three different occasions in February and March 2015. During those

15

occasions, Wyatt tried to sell the undercover agents gunsmithing services, as well. Customers were able to purchase firearms from Gunsmoke's website or by phone. The store advertised on Facebook. Wyatt posted videos on YouTube of gunsmithing that was going on during this time at Gunsmoke. From the date it no longer had Triggers' FFL, April 1, 2013, until the ATF/IRS raid in March 2015, Gunsmoke earned $306,636.94 from gunsmithing.

Wyatt was able to continue operating Gunsmoke in this manner by affiliating with several acquaintances who held FFLs. Wyatt entered into an arrangement with a friend, Richard Rutan, who had an FFL and ran a gun store, Gunner's Den, located near Gunsmoke. Firearms that Gunsmoke acquired or transferred went through Gunner's Den and its A & D log. When Gunsmoke sold a firearm, for example, Wyatt or his staff would send that customer to Gunner's Den to complete the required background check before taking possession of the firearm. Sometimes the firearm a Gunsmoke customer purchased was at Gunner's Den, but often someone from Gunsmoke would have to take the firearm from Gunsmoke to Gunner's Den, have the firearm entered into Gunner's Den's A&D book, and then have Gunners Den physically transfer that firearm to the Gunsmoke customer.

A similar procedure occurred when a customer left a firearm with Gunsmoke for a gunsmithing project that required more than a day's work. The firearm would be entered into Gunner's Den's A&D log, Gunsmoke would do the gunsmithing project, the customer would pay Gunsmoke, but then go to Gunner's Den to retrieve the firearm.

According to Gunner's Den's owner Rutan, he initially thought that Wyatt was using Rutan's FFL just to sell off Gunsmoke's leftover inventory and finish any remaining gunsmithing projects that had been ongoing before Triggers, doing business as Gunsmoke, lost its FFL. But over time it became apparent to Rutan that Gunsmoke was doing more than simply winding down its business. Rutan's assistant, who logged Gunsmoke firearms in and out of Gunner's Den's A&D book, testified that he came to the same conclusion.

Gunner's Den ordered new firearms for Gunsmoke, after Triggers surrendered its FFL. Wyatt also ordered firearms for Gunsmoke through an acquaintance who ran a gun shop in Wisconsin, Hide Side, Ltd. Wyatt got his firearms distributor to agree to send the firearms Wyatt needed to Hide Side, Wyatt then had Hide Side order specific guns for him and ship those guns, not to Gunsmoke, but to Rutan's Gunner's Den, where they would be entered into Gunner's Den's A&D log. Some of those Gunsmoke firearms were kept at Gunner's Den, but others were found at Gunsmoke, despite remaining in Gunner's Den's A&D log.

Wyatt, Rutan and others involved in these arrangements to keep Gunsmoke in business testified that they did not think what they were doing was against the law. But there is evidence from which a reasonable jury could find otherwise.

For example, soon after Triggers, doing business as Gunsmoke, surrendered its FFL, Gunsmoke changed how firearm sales were rung up at the store. Before Triggers surrendered its FFL, the receipt Gunsmoke gave a customer for a firearm purchase indicated that the transaction involved a firearm. But after Triggers

17

surrendered its license, Gunsmoke started to ring up firearm sales as "misc,"
indicating the customer had purchased some unidentified miscellaneous item.  By
ringing up sales this way, reports generated by Gunsmoke's computerized point-of-
sale system, which recorded each sale Gunsmoke made, indicated that Gunsmoke's
firearm sales dropped from a third to one-half of the store's business down to just
9%, while sales of "miscellaneous" items increased significantly.  From this
evidence, a reasonable jury could find that Gunsmoke was hiding the volume of gun
sales it continued to make after Triggers forfeited its FFL.

Additionally, Wyatt, Wyatt's main salesperson Colt Blackmer, Gunner's Den's
owner Rutan, and Rutan's assistant, Tyler Morgan, each on occasion lied to
Gunsmoke customers who questioned the unusual procedure by which the customer
had to go to Gunner's Den to complete a background check and firearm purchase
from Gunsmoke.  Wyatt told a customer that Gunsmoke's internet was down, so the
customer's required background check had to be conducted through Gunner's Den.
Rutan told one of the undercover officers that Gunsmoke's guns were in Gunner's
Den's inventory because they were being sold on consignment.  Wyatt, Blackmer,
Rutan, and Morgan each told other customers on occasion that Gunsmoke's FFL was
"on hold" (III R. 214-15, 342), sometimes adding that Wyatt was working on
straightening out that problem.  But there was no indication Wyatt was trying to
straighten things out with the ATF.  Wyatt also lied to a gunsmith he hired, telling
the gunsmith that Wyatt had his lawyers working on getting his FFL reinstated, when
there was no indication that Wyatt was taking any such steps.  Based on this

18

evidence, a reasonable jury might wonder why, if these participants believed the arrangement between Gunsmoke and Gunner's Den was lawful, they lied about it.

There was evidence, too, that Gunner's Den's A&D log did not always accurately reflect the disposition of Gunsmoke firearms. There were firearms belonging to Gunsmoke that were entered into Gunner's Den's A&D log and then transferred to a Gunsmoke customer, yet Gunner's Den's log inaccurately continued to indicate that that firearm remained in Gunner's Den's inventory. At other times, Gunner's Den's A&D log inaccurately recorded the name of the customer to whom Gunner's Den had transferred a Gunsmoke firearm. A reasonable jury could find that this was just sloppy record-keeping but a jury could also conclude that there were further attempts to obfuscate that Gunsmoke was transferring firearms to its customers using Gunner's Den.

There was also testimony that, legally, when Triggers' FFL terminated, any remaining inventory of firearms became the personal property of the business licensee's responsible persons and such a responsible person could then transfer those firearms just as any private citizen could. The problem with that, for Wyatt and Gunsmoke, was that Triggers' listed responsible persons were the Meidels, but it was Wyatt, not the Meidels, who financed Gunsmoke's firearm inventory. Nevertheless, after Triggers surrendered its FFL, Gunsmoke would often transfer a firearm from its inventory to its customers through Gunner's Den using Brian Meidel's name. To facilitate this arrangement, Gunner's Den kept a photocopy of Brian Meidel's driver's license in order to use that information to log the Gunsmoke gun into

19

Gunner's Den's A&D book before Gunner's Den then transferred possession of that weapon to the Gunsmoke customer. Gunner's Den would transfer the Gunsmoke firearm using Brian Meidel's name, regardless of whether it was Brian Meidel or someone else from Gunsmoke who brought the firearm and customer to Gunner's Den. The purchase price for these weapons went to Gunsmoke and Wyatt, not Brian Meidel. A reasonable jury could find beyond a reasonable doubt that Brian Meidel was not transferring these firearms as a private citizen, but that Wyatt was trying to legitimize Gunsmoke's continued firearms sales and trades by falsely conducting those sales and trades using Brian Meidel's name. A reasonable jury could further find that Wyatt, with the help of the others involved in his arrangement with Gunner's Den, was covering up that Gunsmoke was continuing to transfer firearms to customers, even though it had no FFL.

Based on all of this evidence, then, a reasonable jury could find beyond a reasonable doubt that Wyatt and others involved in these arrangements, including Rutan, knew these arrangements, which allowed Wyatt to continue to operate Gunsmoke without any FFL, was unlawful.

## IV. CONCLUSION

Wyatt's two conspiracy convictions for conspiring to deal in firearms without a federal firearms license are VACATED because the district court failed to instruct the jury that, to convict Wyatt of each of those two charged conspiracies, they had to find that Wyatt and those with whom he conspired acted willfully; that is, that they knew that they had agreed with each other to do something that was unlawful. But,

20

viewing the trial evidence in the light most favorable to the Government, a reasonable jury, properly instructed, could have found from that evidence that Wyatt and his co-conspirators knew that the conduct they agreed to undertake—helping Wyatt continue to deal in firearms at Gunsmoke without an FFL—was unlawful. We, therefore, REMAND this case to the district court for further proceedings on the two conspiracy counts.[7]

---

[7] Wyatt also argues that his conspiracy convictions should be vacated because of prosecutorial misconduct based on the prosecutor asking Wyatt on cross-examination if he recalled the "ATF seizing machine guns from [Gunsmoke] in 2010" (III R. 1257). Because we have already ruled that the two conspiracy convictions must be vacated, we need not address this additional argument. But, in any event, there was no reversible error stemming from the prosecutor's challenged question. Before the witness could answer, defense counsel objected to this question under Fed. R. Evid. 403, arguing that the prejudice from the testimony that question would elicit outweighed any probative value; the district court agreed and sustained the objection. The defense did not request a cautionary instruction at that time, but at the conclusion of the trial, the court instructed jurors generally that jurors "must disregard entirely any proposed testimony or proposed exhibit to which an objection was sustained" (III R. 1322). We presume jurors followed that instruction. See United States v. Hargrove, 911 F.3d 1306, 1319 (10th Cir. 2019).